**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANTS:

**KAREN M. HEARD**
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**CHRISTINE REDELMAN**
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF )
THE PARENT-CHILD RELATIONSHIP OF: )
)
A.P., P.M., & A.T., Minor Children, )
)
 and )
)
S.T., Mother, )
)
 Appellant-Respondent )
)
   vs. )  No. 82A01-1402-JT-74
)
THE INDIANA DEPARTMENT OF CHILD )
SERVICES, )
)
 Appellee-Petitioner. )

APPEAL FROM THE VANDERBURGH SUPERIOR COURT
The Honorable Brett J. Niemeier, Judge
Cause Nos. 82D01-1310-JT-94, 82D01-1310-JT-95, 82D01-1310-JT-96

**November 21, 2014**

**BROWN, Judge**

S.T. ("Mother") appeals the involuntary termination of her parental rights to her children, A.P., P.M., and A.T. ("Children"). Mother raises two issues which we revise and restate as:

I.      Whether the trial court abused its discretion in denying Mother's motion to continue the termination hearing; and

II.     Whether the evidence was sufficient to support the termination of Mother's parental rights.

We affirm.

FACTS AND PROCEDURAL HISTORY

Mother is the biological mother of A.P., born March 4, 2003, P.M., born July 6, 2007, and A.T., born November 19, 2009. Mother has struggled with substance abuse for many years and has compiled an extensive criminal history that spans twelve years, beginning with a 2001 conviction of a class C misdemeanor possession of a look-a-like substance and including felony convictions for neglect of a dependent, possession of marijuana, and possession of methamphetamine, as well as the revocation of her probation on several occasions. The Indiana Department of Child Services ("DCS") first filed a child in need of services ("CHINS") petition on behalf of A.P. in 2007 when crack cocaine and methamphetamine were discovered in the home where Mother was living. In the 2007 dispositional order, the court found that random drug screens, parent aide, parenting beliefs and nurturing classes, and substance abuse treatment and evaluation would aid Mother in

her efforts to keep A.P. In 2008, DCS filed CHINS petitions on behalf of A.P. and P.M. when Mother faced charges involving marijuana and child neglect. In the 2008 CHINS case, the court's dispositional order required Mother to participate in services aimed at addressing the issues that were impeding her ability to care for A.P. and P.M..

The CHINS case underlying the first set of termination proceedings began on March 2, 2011, when DCS filed new petitions alleging that the Children were CHINS on the basis of Mother's drug use and failure to provide a suitable home environment. On March 16, 2011, the trial court adjudicated the Children as CHINS. On April 13, 2011, the court entered its dispositional order, which incorporated by reference the terms of the Parental Participation Plan, in which Mother agreed, among other things, to participate in parent aide programs, substance abuse evaluation and treatment, parenting education and nurturing classes, random drug screens, supervised or monitored visits with the Children, to remain drug and alcohol free, and to maintain weekly contact with the Children's family case manager.[1]

DCS filed termination proceedings on October 26, 2011 and provided a court appointed special advocate ("CASA") for the Children. On August 9, 2012, the court held a hearing on the termination proceedings. At the hearing, the court heard testimony from Mother, Stephanie Witty, an employee of the Vanderburgh County Sheriff's Office in the Community Corrections Division, Nicole Simpson, the Children's CASA, Leah

---

[1] Although the record contains a copy of each parental participation plan and dispositional decree, the plan and decree for each child is the same, therefore, citation is made to the record for A.P., Mother's eldest child.

3

Weinzapfel, the Children's second family case manager, and Jennifer Hein, the Children's family case manager from July 2011 through February 2012. The court also heard testimony that demonstrated Mother struggled to maintain housing and to remain drug free, to participate in parenting services during her CHINS case, and to hold a steady job. Exhibits introduced into evidence during the hearing showed that Mother's criminal history included a January 14, 2005 guilty plea for possession of a controlled substance as a class A misdemeanor, that in 2009, Mother pled guilty to felony neglect of a dependent as a class C felony and possession of marijuana as a class D felony, and that on January 3, 2012, she pled guilty to possession of methamphetamine as a class D felony, for which she was ordered to spend part of her thirty-six month sentence in jail, part in work release, and the remainder in Drug Abuse Probation Services. She had her probation revoked on November 15, 2012, and, on December 6, 2012, she was revoked from work release.

Mother indicated that, after her services were stopped prior to the August 9, 2012 termination hearing, she had not asked her caseworker to put those services back in place. CASA Simpson and family case manager Weinzapfel both testified that since June 2011 the Children have lived with relatives: A.P. was living with her paternal grandparents, P.M. was living with his paternal grandmother and aunt, and A.T. was living with her maternal aunt and uncle. Evidence was also presented that DCS offered Mother a range of services a including substance abuse evaluation and random drug screens, parent aide and domestic violence services, along with child and family team meetings and individual, group, and grief counseling. Hein testified that Mother "was active in some of the services but she never completed any of them." DCS Exhibit 41 at 106-107. Hein further testified that

4

Mother "participate[d] in . . . some random drug screens. She also failed to appear, tampered with, and tested positive on several. She did attempt with some parent aide sessions, but she also cancelled early, didn't show up at some of them, and then cancelled them in advance." Id. at 107. Hein stated that Mother "never completed the batterers intervention program, the nurturing program, the parenting classes" and that she often had problems contacting Mother. Id.

After the hearing, the court issued a termination order on October 10, 2012. Mother relapsed into drug use two weeks after she learned that her parental rights were terminated. She was then arrested on November 13, 2012, and was in jail until January 11, 2013. She appealed the trial court's termination order, and, on May 23, 2013, this court reversed the termination of Mother's parental rights because DCS failed to satisfy the requirements of Ind. Code § 31-35-2-4(b)(2)(A) which requires that the petition allege that certain time periods have passed such as the removal of the child from the parent for at least six months. In re P.M., No. 82A01-1212-JT-548, slip op. at 3 (Ind. Ct. App. May 23, 2013).

On May 29, 2013, DCS filed another termination petition. On June 10, 2013, Mother was charged with possession of methamphetamine, unlawful possession or use of a legend drug, possession of marijuana, and possession of paraphernalia. Following her arrest, DCS visited Mother in jail and notified her that the October 10, 2012 termination order had been reversed on appeal. On October 10, 2013, because of the time requirements provided by the termination statute, DCS filed new termination petitions with respect to the Children.

On November 1, 2013, the court held an evidentiary hearing on the October 10, 2013 termination petitions. The court heard testimony from Mother, Weinzapfel, Simpson, and Erica Rasler, a DCS caseworker who had recently assumed responsibility for Mother's case file. At the start of the hearing, Mother's counsel requested a continuance, stating that she would "ask the Court to consider continuing this case. My client expects to be released from incarceration in the beginning of December." Transcript at 9. The court denied Mother's request, explaining that the "[c]ourt will continue to deny the request for continuance based upon the timeliness issues as required by statute, but also just the circumstances involving the children in this case." Id. at 10.

DCS introduced and the court admitted exhibits that had been introduced by DCS at the first termination proceeding, including records of Mother's convictions with the exception of Exhibit 22, which was not admitted. DCS then called Mother as a witness, and she testified that she was incarcerated at the Vanderburgh County Jail. She stated that she had been in jail for about five months on a possession of methamphetamine charge, and that during periods when she was not incarcerated, she rented a home but did not hold a job. She indicated that since the date of the first termination hearing, August 9, 2012, she had not been incarcerated for a period of eight months within that timeframe, and testified that within the last three to four years she "had a two and a half year period and that ended 2011" where she had not been accused of a crime. Id. at 21-22. Mother testified that when she was incarcerated, she was unable to participate in DCS services, that most of her arrests stemmed from her drug problems, and that after her release from

6

jail she planned to live with her mother and work as a "dispatch[er] at Medcalf." Id. at 24.

Regarding her plans for treatment, Mother stated:

> While being incarcerated I have been talking to Pat Townsend with City Church. And I've been through fellowship classes and celebrate recovery, thinking for a change, and going to church. And the ladies who do celebrate recovery have sent me (inaudible) and they have celebrate recovery (inaudible) and would like me to (inaudible). I've also contacted (inaudible) and asked her if we could still have one on ones where I went one time. And with my past experience with AA and NA I'd rather just be with celebrate recovery and have fellowship with the church. I met with the pastor of (inaudible) Church just last week (inaudible). And he'd like me to attend his church to see if I like it. It's here in town. There's (inaudible) classes that are like fellowship classes that are going on at the church that I'd like to attend. And then with my job. And last year I tried to start going to school and I was kept from that 'cause I was in the Safe House and they wouldn't allow me to go after I was already signed up.

Id. at 25-26.

On cross-examination, Mother admitted that she has had issues with methamphetamine but was off drugs and intended to stay clean. She explained to the court that "the reason why I want to stay clean and do better is the hope of eventually still being able to see my children and being a part of their lives." Id. at 29. Mother indicated that at the time of the August 9, 2012 termination hearing she was clean, participating in Counseling for Change, and was out of jail. She explained that while she was incarcerated she believed her parental rights to her Children had been terminated and that since February 23, 2012, she had been "[c]ourt ordered not to have contact with the kids. . . ." Id. at 32. Mother stated that she had not seen the Children since February 2012 when her services were stopped, and she was court ordered not to contact the Children while the termination proceeding was underway. She also indicated that since her June 2013 arrest, she had not

7

visited with her Children, had not been offered to participate in services by DCS, had not met with a parent aide, and had met with the caseworker only when she was in court. Mother explained that her long-term plans following her release from incarceration involved moving into her own home and studying business management at Ivy Tech.

Mother stated that she was out of jail on January 11, 2013 but did not contact her caseworker or provide the caseworker with a phone number and address. She explained that, following the date of the termination and up to June 2013, when DCS notified her that the order was reversed on appeal, Mother believed that her parental rights were terminated, and that she "had no rights to know anything or do anything." Id. at 41. However, she subsequently indicated that she never called and asked her attorney about the progress of her appeal and struggled to recall whether she had even pursued an appeal.

Weinzapfel, the DCS caseworker, testified that after the reversal of the October 10, 2012 termination order she attempted to locate Mother. Weinzapfel indicated that once Mother was located, on June 7, 2013, another DCS caseworker served Mother with papers for the second termination hearing on June 11, 2013. Weinzapfel stated that the Children were living in the same relative placements as they had been during the August 9, 2012 hearing, and she reported that the Children were doing well in their placements. She also observed that the Children had, with time, responded well to their placements with family, and that the Children suffer from medical conditions that require attention. A.T. suffers from reflux in her kidneys and was diagnosed with epilepsy. P.M. requires monitoring after blood was found in his urine. A.P. has partial blindness in one eye and has been through counseling to address issues related to Mother's struggles with drugs and

8

incarceration. Weinzapfel also explained that Mother was not receiving DCS services following the February 21, 2012 termination hearing through the August 9, 2012 hearing.

Simpson, the Children's CASA, who began working with them on March 28, 2011, stated to the court that the Children were doing well in their relative placements. She stated that she "believe[d] that the best interest of the [C]hildren is to be adopted by these families." Id. at 57. In support of her belief, Simpson further testified that Mother:

> has been in and out of jail. [Mother has] struggled with drugs in and out, has not had a consistent job, has not followed through on programming as far as when she was at the Counseling for Change. Hasn't really took [sic] the initiative. At one point in this case there was . . . they maxed out the services . . . . This is [A.P.'s] third CHINS case. This is [P.M.'s] second CHINS case. And this is [A.T.'s] first [CHINS]. There's no consistency there. And this is what these kids need to continue to grow and blossom and grow into mature young adults and not fall through the cracks.

Id. at 57-58. Simpson also testified that "when [Mother is] in jail, yes, we know where she's at" but otherwise indicated the difficulty of locating or contacting Mother. Id. at 59. Rasler, the new DCS employee responsible for the case, indicated that DCS still intended to terminate Mother's rights and place the Children up for adoption.

On January 15, 2014, the court entered a termination order ("Termination Order") which stated that Mother:

> has been a participant in drug court. [Mother] has been to several facilities for substance abuse treatment in multiple child in need of services cases as follows: (1) New Visions, which ended when she tested positive; (2) two times at Stepping Stones, where she simply stopped attending; and (3) two times at Counseling for Change, where she simply stopped attending or she tested positive for methamphetamine and Ecstasy.

Appellant's Appendix at 62. The court also found that Mother had failed to participate in court ordered parenting services, stating that:

9

[Mother] failed to complete the provisions of her parental participation plan agreement in that she did not complete a nurturing class, did not participate in grief counseling, did not complete her treatment programs at Counseling for Change, did not have stable employment, and did not obtain and maintain a stable home. Despite Court sanctions for failure to comply with the parental participation plan, [Mother] made no substantive change in completion of her services.

Id. at 63. The court noted when Mother was not incarcerated she was often "late to visits and cancelled visits with [the Children]." Id. at 64. At the conclusion of its Finding of Facts section, the court observed that the Children "are thriving in their current pre-adoptive placements with family. [The Children] see each other on a routine basis and are engaged in activities which enrich their lives." Id. at 65. The court concluded that DCS had demonstrated that the Children had been removed from Mother's care and custody for the statutory time period, and concluded that there was a reasonable probability that the conditions leading to removal would not be remedied because Mother "is an addict and places her drug usage and lifestyle above her children." Id. at 67. The court further concluded that there was a reasonable probability that continuing the parent-child relationship posed a threat to the Children's well-being because Mother's addiction "does not allow the children to be cared for consistently in a safe, stable and secure home." Id. The court also concluded that termination was in the Children's best interests because "[the Children] need a permanent loving safe home." Id. Finally, the court determined that the DCS plan for the Children after termination of parental rights, which was adoption, was "acceptable, clearly obtainable and satisfactory." Id.

DISCUSSION

I.

The first issue is whether the trial court abused its discretion in denying Mother's motion to continue the termination hearing. Mother claims she "presented good cause for the continuance and was prejudiced by the trial court's denial of her Motions due to its effect on her ability to demonstrate changed circumstances to the court." Appellant's Brief at 6. DCS contends that Mother has waived this argument because she did not state that she needed time to participate in services following her release and instead stated only that she would soon be released from incarceration. DCS also maintains that, waiver notwithstanding, Mother did not explain to the court how she would be prejudiced without a continuance.

A trial court's decision to grant or deny a motion to continue is subject to abuse of discretion review. In re K.W., 12 N.E.3d 241, 244 (Ind. 2014) (citing Rowlett v. Vanderburgh Cnty. Office of Family & Children, 841 N.E.2d 615, 619 (Ind. Ct. App. 2006), trans. denied). Ind. Trial Rule 53.5 provides that a court may grant a continuance upon a showing of "good cause." Discretion is a privilege afforded a trial court to act in accord with what is fair and equitable in each circumstance. J.M. v. Marion Cnty. Office of Family & Children, 802 N.E.2d 40, 43 (Ind. Ct. App. 2004), trans. denied. A decision on a motion for continuance will be reversed only upon a showing of an abuse of discretion and prejudice resulting from such an abuse. Id. "An abuse of discretion may be found in the denial of a motion for a continuance when the moving party has shown good cause for granting the motion," but "no abuse of discretion will be found when the moving party has

11

not demonstrated that he or she was prejudiced by the denial." Id. The Indiana Supreme Court has explained that an abuse of discretion analysis consists of an "evaluation of facts in relation to legal formulae. In the final analysis, the reviewing court is concerned with the reasonableness of the action in light of the record." Id. at 44 (citing Tapia v. State, 753 N.E.2d 581, 585 (Ind. 2001)). Thus, a trial court's ruling should be set aside only if it is clearly against the logic and effect of the facts and circumstances before the court, and we will not substitute our judgment for that of the trial court. Id.

As noted above, the sole reference to Mother's request for a continuance is the oral request she made at the outset of the November 1, 2013 hearing, which the court denied. Mother's counsel stated that Mother expected to be released from incarceration in "the beginning of December." Transcript at 9. At the hearing, Mother was present and was represented by counsel, who cross-examined witnesses. During the hearing, Mother informed the court regarding the steps she intended to take to control her addictions. Weinzapfel explained that Mother had not participated in services since February 2012, and, in her brief, Mother does not point to specific instances of compliance with prior participation decrees or participation in services while in jail.

Courts must consider the cost a delay in termination proceedings places on the children. See In re E.E., 853 N.E.2d 1037, 1043 (Ind. Ct. App. 2006) (noting that delays in termination proceedings often exact "an intangible cost to the life of the children involved"), trans. denied. The court explained that it declined to grant Mother's motion for continuance because of "the circumstances involving the children in this case." Transcript at 10.

12

To the extent Mother argues DCS did not provide her with services while she was in jail, we observe that the absence of services was due to Mother's incarceration, and she does not point to any evidence that she specifically requested visitation or other services. See In re H.L., 915 N.E.2d 145, 148 (Ind. Ct. App. 2009) (holding that the inability to provide services under such circumstances did not amount to a denial of due process).

Further, regarding Mother's reference to Rowlett to support her argument that when the court denied her oral request for a continuance at the termination proceeding she was denied the opportunity to demonstrate evidence of changed circumstances, we observe that Mother had many opportunities to participate in services throughout her Children's prior CHINS proceedings. Unlike the father in Rowlett, who was granted a continuance in part because he "participated in numerous services and programs, [during his incarceration] which would be helpful to him in reaching his goal of reunification with his children," 841 N.E.2d at 619, Mother had been offered services in the past, which she neglected to utilize fully towards her benefit, and, in her brief, does not point to specific instances where she participated in parenting or other services during the term of her most recent incarceration that would demonstrate the "good cause" required by Ind. Trial Rule 53.5 for a continuance. Moreover, in light of Mother's presence and testimony at the hearing and her historical struggles with fulfilling the requirements of DCS-sponsored parenting and substance abuse programs, we cannot say that the court erred or abused its discretion when it denied Mother's oral request for a continuance.

## II.

The next issue is whether evidence presented at the hearing was sufficient to support the trial court's termination order. We first acknowledge that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. In re K.S., 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). Thus, when reviewing the trial court's judgment, we will not reweigh the evidence or judge the credibility of the witnesses. In re D.D., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied. Instead, we consider only the evidence and reasonable inferences therefrom that are most favorable to the judgment. Id.

Here, the trial court's order contained specific findings of fact and conclusions of law. When reviewing findings of fact and conclusions of law entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we must determine whether the evidence supports the findings. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). Second, we determine whether the findings support the judgment. Id. In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), reh'g denied, trans. denied, cert. denied, 534 U.S. 1161, 122 S. Ct. 1197 (2002); see also Bester, 839 N.E.2d at 147. A finding is clearly erroneous when there are no facts or inferences drawn therefrom that support it. D.D., 804 N.E.2d at 265. A judgment is clearly erroneous only if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. Bester, 839 N.E.2d at 147.

14

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. Moreover, because termination severs all rights of a parent to his or her child, the involuntary termination of parental rights is arguably one of the most extreme sanctions a court can impose; consequently, such a sanction is intended as a last resort, available only when all other reasonable efforts have failed. In re T.F., 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), trans. denied. Nevertheless, parental rights are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate a parent-child relationship. Id. Because the purpose of terminating parental rights is to protect the child, not to punish the parent, parental rights may be properly terminated when a parent is unable or unwilling to meet his or her parental responsibilities. K.S. 750 N.E.2d at 836.

Moreover, a trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In order to terminate a parent-child relationship, the State is required to allege and prove, among other things:

(B)     that one (1) of the following is true:

    (i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

15

> > (iii)     The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)     that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2); see also Ind. Code § 31-35-2-8. The State must establish each of these allegations by clear and convincing evidence. Egly v. Blackford Cnty. Dep't of Pub. Welfare, 592 N.E.2d 1232, 1234 (Ind. 1992).

A.     Remedy of Conditions

Ind. Code § 31-35-2-4(b)(2)(B) is written in the disjunctive and requires the State to establish, by clear and convincing evidence, only one of the three requirements of subparagraph 4(b)(2)(B). Because we find it dispositive, we limit our review to Mother's allegations of error pertaining to subsection (b)(2)(B)(i) of Indiana's termination statute, namely, whether DCS presented clear and convincing evidence establishing that there is a reasonable probability that the conditions leading to the removal and continued placement of the Children outside Mother's care will not be remedied. When determining whether a reasonable probability exists that the conditions justifying a child's removal and continued placement outside the home will not be remedied, the trial court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. Nevertheless, a court may take into account past patterns of conduct at the time of the termination hearing. Id. Recent Indiana Supreme Court precedent reiterates the valid use of historical patterns of conduct in light of assessing a parent's fitness to care for children at the time of the termination hearing. See In re E.M.,

16

4 N.E.3d 636, 643 (Ind. 2014) ("Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior.").

Mother argues that DCS failed to prove by clear and convincing evidence that the conditions that resulted in the Children's removal would not be remedied, and she contends that neither of the DCS caseworkers who testified at the November 1, 2013 hearing nor the Children's CASA had sufficient information to conclude that Mother had not remedied the conditions that resulted in the Children's removal or placement outside the home. DCS contends that Mother has failed to "make specific arguments and point out evidence (or lack thereof) to challenge the sufficiency of the evidence supporting [the] Court's judgment." Appellee's Brief at 24. DCS maintains that Mother does not specifically challenge the court's factual findings and that, with respect to providing services, DCS was not required to provide services in a termination proceeding.

We observe that Mother does not cite to authority or provide specific references to support her argument and, as a result, Mother waives her argument. See Ind. Appellate Rule 46(A)(8)(a) ("The argument must contain the contentions of the appellant on the issues presented, supported by cogent reasoning. Each contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on, in accordance with Rule 22.") See also Loomis v. Ameritech Corp., 764 N.E.2d 658, 668 (Ind. Ct. App. 2002) (holding argument waived for failure to provide cogent argument), reh'g denied, trans. denied.

17

Waiver notwithstanding, to the extent Mother argues that DCS failed to prove that conditions would not be remedied, we note that Mother does not challenge the court's findings of fact, which detail Mother's struggles with addiction, pattern of unstable housing and employment, and her criminal convictions for drug crimes. Mother has had repeated drug related arrests that have adversely impacted her ability to care for her children. Moreover, one of those arrests involved charges of child neglect. Mother had an arrest for methamphetamine possession prior to the most recent termination proceeding. Although Mother explained to the court that she planned to participate in drug counseling through her church once she was released from incarceration, and she planned to work as a dispatcher for Medcalf, her pattern of conduct demonstrates that she has not shown that she has remedied, or that she did not have adequate opportunity to remedy, the conditions that led to the Children's removal.

Based upon the record we conclude that clear and convincing evidence supported the court's determination that there was a reasonable probability that the conditions leading to the Children's removal would not be remedied based on Mother's ongoing substance abuse issues, history of drug arrests, and past failure to participate in DCS services.

B.    Best Interests

With respect to the Children's best interests, Mother contends that DCS "failed to show by clear and convincing evidence" that "termination is in the best interest of the child." Appellant's Brief at 12. In support of her argument, Mother asserts that any delay in DCS's permanency plan, adoption, would not "cause harm to the children, as their placement would not be interrupted." Id. DCS maintains that Mother's prior unsuccessful

18

attempts to participate in DCS-sponsored services, repeated incarcerations, and the Children's need for stability demonstrate that termination is in the Children's best interests.

In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the DCS and to the totality of the evidence. McBride, 798 N.E.2d at 203. In so doing, the court must subordinate the interests of the parent to those of the child. Id. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Id. Moreover, the recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in a child's best interests. A.D.S. v. Ind. Dep't of Child Servs., 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), trans. denied.

The record reveals that the Children's CASA testified at the November 1, 2013 hearing that it was her belief that the Children's best interests would be served if Mother's parental rights were terminated. The Children's case manager also testified at the hearing that the Children had adjusted to their relative placements and were doing well. Based on the totality of the evidence, including Mother's habitual pattern of drug abuse, criminal history, and her most recent incarceration, coupled with the testimony from both the DCS case manager and CASA, we conclude that clear and convincing evidence supports the trial court's finding that termination of Mother's parental rights is in the Children's best interests. See, e.g., In re A.I., 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (concluding that testimony of child advocate and family case manager, coupled with evidence that conditions resulting in continued placement outside home will not be remedied, was

19

sufficient to prove by clear and convincing evidence termination is in child's best interests), trans. denied.

## CONCLUSION

Based upon our review of the record, we conclude that the trial court's judgment terminating Mother's parental rights related to the Children is supported by clear and convincing evidence. We find no error and affirm.

Affirmed.

BARNES, J., and BRADFORD, J., concur.