## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 31 2015, 10:00 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Deidre L. Monroe
Public Defender's Office
Gary, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of:

C.G., I.G., and S.G. (*Minor Children*),

and

J.G. (*Mother*)

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

December 31, 2015

Court of Appeals Case No. 45A04-1506-JT-518

Appeal from the Lake Superior Court

The Honorable Thomas Stefaniak, Jr., Judge

Trial Court Cause No. 45D06-1307-JT-138 45D06-1307-JT-139 45D06-1307-JT-192

**Robb, Judge.**

# Case Summary and Issue

J.G. ("Mother") appeals a juvenile court's order terminating her parental rights to her children C.G., I.G., and S.G. ("Children"). Mother raises several issues for our review, which we consolidate and restate as whether the juvenile court's termination order is supported by clear and convincing evidence. Concluding the juvenile court's order is supported by clear and convincing evidence, we affirm.

# Facts and Procedural History

On March 28, 2012, the Indiana Department of Child Services ("DCS") received a report regarding the safety and well-being of three-month-old S.G., six-year-old C.G., seven-year-old I.G., Jr., sixteen-year-old A.G., and seventeen-year-old D.G. All five children lived with Mother and I.G., Sr. ("Father") in a home in Gary, Indiana.[1] The report alleged the family's home contained "garbage up to your knees" and mold. State's Exhibit B. The report further claimed S.G. was "filthy" because the family rarely bathed her or changed her diaper. *Id.* In addition, the Children did not attend school, the

---

[1] Father is A.G.'s stepfather. Mother is D.G's stepmother. We note Father does not appeal the juvenile court's decision to terminate his parental rights. References to Father are for the sole purpose of providing clarity.

family did not have any formula for S.G., S.G. had gone forty-eight hours without feeding, and the teenagers in the home smoked marijuana.

[3]     On the same day, Family Case Manager Michelle Kingery and a lieutenant from the Gary Police Department conducted an unannounced visit at the family's home. Upon approaching the home's front door, the lieutenant recognized a strong odor of urine and feces; Kingery noticed an extremely cluttered front yard filled with garbage. The pair's attempt to make contact with the family proved unsuccessful.

[4]     On April 4, Kingery contacted Grissom Elementary School in Gary, Indiana. The school told Kingery that C.G. and I.G. had been removed from the school six months prior because Mother planned to homeschool the Children. The school also stated A.G. and D.G. were being homeschooled as well. On April 12, DCS filed a report in the juvenile court claiming the Children were likely victims of abuse and neglect; DCS requested a pick-up order be issued. After the juvenile court issued a pick-up order, Kingery, accompanied by officers of the Gary Police Department, returned to the family's home. After knocks to the front door went unanswered, the police officers entered forcibly. The home was unsuitable for children:

> The residence was infested with flies and cockroaches and there was animal urine and feces throughout the residence. The two mattresses in the home were unsanitary and the home had a strong odor of cat urine and dog feces. The animals had defecated and urinated throughout the home. The home had little food and included many hazards such as roaches in the

bassinet, mold on the walls, and a stove balanced on top of 5 gallon buckets in the laundry room.

State's Ex. D.

[5] The following day, Kingery discovered the family had been attempting to avoid contact with DCS. In order to avoid DCS, the family had been spending their days at a residence in Demotte, Indiana, and late in the evening, the family would return to the residence in Gary. When Kingery arrived at the new residence, she interviewed Mother. In regards to the Children's education, Mother claimed she was homeschooling the Children, but Mother could not provide Kingery with a name of a standardized home schooling curriculum, attendance records, or text books; Mother stated the text books had been misplaced during the family's move. Ultimately, Kingery removed the Children from Mother's care and placed the Children in foster care.

[6] On April 17, DCS filed a Child in Need of Services ("CHINS") petition. On the same day, the trial court held an initial hearing on the matter. At the hearing, both Father and Mother admitted the material allegations set forth in the petition. The juvenile court adjudicated all five children CHINS and ordered the family to participate in certain services, including family counseling, therapy, and supervised visitation.

[7] In early May, A.G. disclosed to her therapist, Annette Brown, a history of molestation by Father; A.G. claimed Mother was aware of the sexual abuse. When Brown disclosed A.G.'s allegations to Mother, Mother "just kept saying,

'I knew it.  I knew he did this.  I knew it.'"  Transcript at 146.  John Gruska, head of the Lake County Sheriff Children & Family Assistance Bureau, interviewed Mother in regards to A.G.'s allegations.  Gruska later testified about the interview:

> [DCS:]  Do you remember what [Mother] told you about the allegations of being molested—of [A.G.] being molested?
> [Gruska:]  Well there was—she never actually saw [Father] and [A.G.] in a sexual encounter, but there was some things [sic] she saw that made her suspicious at that time.
> [DCS:]  What did she tell you?  Like what?
> [Gruska:]  That she'd walk in and see [Father] and [A.G.] were in bed together one time and that his pants and underwear were pulled down to mid-thigh.  That he seemed to want to spend a lot of time with her.  That they found—she noticed some, like condoms in [A.G.'s] room.

*Id.* at 209-10.  DCS also discovered allegations of domestic violence between Father and Mother.  As a result of the allegations, the juvenile court suspended all contact between Father and the Children.  DCS then instituted a safety plan instructing Mother to cease contact with Father.

[8]     On May 21, the juvenile court issued a dispositional order requiring Mother to participate in reunification services.  Specifically, the juvenile court ordered Mother submit to a domestic violence assessment, a drug and alcohol evaluation, random drug testing, a parenting assessment, parenting classes, and a clinical review and assessment.   Two months later, the State charged Father with multiple counts of child molesting and sexual misconduct with a minor, specifically A.G.

[9] By October, Mother was progressing well with her court-ordered services and continuing to comply with DCS' safety plan; Mother had obtained her own apartment, secured employment, and filed for dissolution of her marriage to Father.[2] As a result of Mother's progress, the juvenile court ordered Mother have unsupervised visitation with the Children. Shortly thereafter, however, it was reported Mother established contact with Father, Mother and Father were often seen together in public, Mother became resistant to services, and Mother stated A.G. required residential hospitalization because she was "psychotic." Appellant's Appendix at 2. The juvenile court then reinstated supervised visitation. In December, DCS became more concerned with the Children's safety after learning Mother stated, in a therapy session, she did not believe Father had caused any harm to A.G. In addition, Mother became highly confrontational with A.G. during a therapy session. As a result, the juvenile court ordered Mother's services be suspended, including all visitation services.

[10] In February 2013, DCS filed a progress report indicating A.G. had requested a change in her permanency plan. Specifically, A.G. did not want to reunify with Mother, "because [A.G.] knows that her mother and [stepfather] will remain a couple. [A.G.] doesn't feel safe with mother or [stepfather]." State's Ex. S. Reunification remained the permanency plan for S.G., C.G., and I.G.; D.G. had reached the age of eighteen and was emancipated. The juvenile court

---

[2] At the time the juvenile court issued its order terminating Mother's parental rights on April 13, 2015, the dissolution was still pending.

ordered Mother receive additional services, including individual therapy, parenting classes, and home-based case management. Thereafter, Mother was evicted from her residence, became unemployed, and struggled to maintain compliance with the court-ordered services.

[11] On July 11, DCS filed a petition for termination of Father's and Mother's parental rights of I.G., C.G., and S.G. In October, the juvenile court ordered Mother's services again be suspended upon learning Mother was pregnant with Father's child. Over the next year, DCS filed multiple progress reports indicating Mother continued to make little or no progress in establishing a stable home or completing the court-ordered services.

[12] In August 2014, Mother secured employment and moved to Wheatfield, Indiana, with her cousin. In October, Mother was deposed in the current case and stated she did not believe Father sexually abused A.G. The following month, Father was convicted of multiple felony counts of child molesting and sexual misconduct with a minor and sentenced to ninety years in the Indiana Department of Correction.

[13] On March 25, 2015, the juvenile court held a hearing in the parent-child termination proceedings. Mother testified her parental rights should not be terminated because she had secured stable housing and income. DCS supervisor Gabriella Garcia testified, however, Mother's parental rights should still be terminated:

[DCS:] If mom has current housing and employment, what's the harm in giving her another chance, from your perspective?

[Garcia:] From DCS' standpoint, it would still be putting the children back into a potentially harmful situation. Even if it's not [Father], it could be somebody else that she could allow to come into the home and potentially molest, you know, one of the other children. You know, [S.G.] . . . . So that would always be an ongoing concern the agency would have.

* * *

[DCS:] Are you then recommending that the court terminate parental rights today?

[Garcia:] Yes.

[DCS:] Do you believe that's in the children's best interest?

[Garcia:] Yes.

[DCS:] And why is that?

[Garcia:] Because right now, they are currently in a situation where they are safe, they're stable, they're doing well in school, they're receiving services that they need and they are not in a situation where somebody is going to come in and harm them. As if, you know, potentially could happen if, you know, they went home with mom.

Tr. at 257-58. Garcia also testified the Children would be adopted by their paternal aunt, Shannon Lehmann, if the juvenile court terminated Mother's parental rights; the Children were originally placed with Lehmann in September 2013. Mother had not had visitation with the Children since December 2012.

[14]    Brown also testified Mother's parental rights should be terminated:

[DCS:] [W]hat's the likelihood of mom actually changing her actual issues in order to be able to reunify with her children? What's the likelihood that she could actually make progress, real progress, going forward?

* * *

[Brown:]  Based on my interactions as [Mother's] therapist for the time that I was her therapist, it is my professional opinion that mom is not stable enough to parent her children.

[DCS:]  And why do you believe, why do you hold that opinion?

[Brown:]  Because she has never, ever accepted and taken ownership for her role as [A.G.'s] mother.  And I worked with A.G. up until two weeks ago and we have processed this, over and over.  And [A.G.] is her daughter.  She's her first born child and she has not protected her.  So, if you don't protect one of your children, I can't, as a professional, say you are going to protect your other two daughters.

[DCS:]  And that's a question, how does her inability to protect [A.G.] affect her ability to protect other children?

[Brown:]  That's my concern as a therapist.  You can't say I love this child more than I love this child.  She has not protected [A.G.].  And I have attempted, as [A.G.'s] therapist, to work with [A.G.] through that and [A.G.] just feels like, my mom has abandoned me and she continued to abandon me, now that [A.G.] is an adult.

[DCS:]  Is [A.G.] afraid for her siblings?

[Brown:]  Very afraid, very afraid.

*Id.* at 166-68.  Mother had not had visitation with the Children since December 2012.

[15]  On April 13, 2015, the juvenile court issued an order terminating Mother's and Father's parental rights.  In doing so, the court found, in relevant part,

> The evidence presented in this matter has established by clear and convincing evidence that there is a reasonable probability that the conditions that resulted in the child's removal or reasons for placement outside the home of the parents will not be remedied.  Again, the children have been removed from the home for approximately three years and neither parent has

participated in any visitation since December 2012. Furthermore, there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the children. No evidence exists to suggest that Mother is capable of protecting the children from dangers which may be presented. Father's removal by way of incarceration does not resolve the concern of Mother's inability to safeguard her children's interests and welfare. Mother has proven incapable of making the necessary changes through the provision of services. DCS has a satisfactory plan for the care and treatment of the children. The children are currently thriving in an appropriate relative placement setting, wherein they have been residing for over one and a half years. The children are attending school regularly and excelling in their educational development. The relative home provides the necessary stability for the children and also affords them the opportunity to maintain sibling relationships with their older siblings. The relative has committed to adopting the children as a sibling group. There is no evidence which suggests the relative is unable to provide necessary care for the children or represents any form of harm to the children's interests and welfare.

Based upon the foregoing, the Court now finds termination of the parent child relationship is in the best interest of the children.

Appellant's App. at 5. Mother now appeals. Additional facts will be added as necessary.

# Discussion and Decision

## I. Standard of Review

[16] "[T]he involuntary termination of parental rights is an extreme measure that is designed to be used as a last resort when all other reasonable efforts have failed

. . . ." *In re K.W.*, 12 N.E.3d 241, 249 (Ind. 2014) (alteration in original) (quotation omitted). Indiana Code section 31-35-2-4(b)(2) provides, in pertinent part, what must be proven in order to terminate parental rights:

> (2) The petition must allege:
> * * *
> > (B) that one (1) of the following is true:
> > > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not remedied.
> > > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> > * * *
> > (C) that termination is in the best interest of the child; and
> > (D) that there is a satisfactory plan for the care and treatment of the child.

The State must prove each element by clear and convincing evidence. Ind. Code § 31-34-12-2; *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009). "Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the . . . parent's custody." *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005) (citations and internal quotation marks omitted).

[17] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility; we consider only the evidence and

reasonable inferences most favorable to the judgment of the juvenile court. *In re A.G.*, No. 20A03-1502-JT-61, 2015 WL 6472209, at *2 (Ind. Ct. App. Oct. 27, 2015). Because the juvenile court entered findings of fact and conclusions of law in terminating Mother's parental rights, we apply a two-tiered standard of review. *Id.* First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We set aside a juvenile court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the juvenile court's conclusions or the conclusions do not support the judgment. *Id.*

## II. Termination Order

[18]     Mother contends the juvenile court's termination order was clearly erroneous in several respects.[3] Specifically, Mother claims DCS failed to prove the conditions resulting in the Children's removal will not be remedied; DCS failed to prove Mother posed a threat to the Children's well-being; DCS failed to prove termination was in the Children's best interest; and DCS failed to prove it had a satisfactory plan for the Children's care and treatment.

---

[3] At the outset, we express dissatisfaction with the Mother's Statement of the Facts. The facts, as phrased by the Mother, are in stark contrast from the record. While we encourage all counsel to advocate for their clients, Indiana Professional Conduct Rule 3.3 requires candor toward the tribunal, and Indiana Appellate Rule 46(A)(6)(b) requires the facts to be stated in accordance with the applicable standard of review. In addition, we could not locate the Chronological Case Summary within the Appellant's Appendix. We remind counsel, pursuant to Appellate Rule 50(A)(2)(a), the Appellant's Appendix shall contain the Chronological Case Summary.

[19] First, Mother argues DCS failed to prove a reasonable probability the conditions leading to the Children's removal will not be remedied. "In determining whether the conditions that led to a child's removal will not be remedied," the juvenile court "must judge a parent's fitness to care for her child at the time of the termination hearing and take into consideration evidence of changed conditions." *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). The language in Indiana Code section 31-35-2-4(b)(B)(i) clarifies "it is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. The juvenile court must also evaluate "the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *In re A.B.*, 924 N.E.2d at 670 (quotation omitted). The juvenile court may also consider the services the State offered to the parent and the parent's response to such services. *Id.*

[20] Mother claims the juvenile court failed to give any weight to her testimony that she only came into contact with Father after a death in the family, and she was confused throughout the CHINS proceedings about whether Father was guilty of molesting A.G. We interpret these arguments as a request for this court to reweigh the evidence and reassess witness credibility, which we will not do. *See In re A.G.*, 2015 WL 6472209, at *2.

[21] The juvenile court found the Children were removed from Mother's care due to poor home conditions and educational neglect. Specifically, the court noted the

Children had been withdrawn from school and Mother was attempting to homeschool them, despite Mother's failure to utilize a formal curriculum, and despite Mother only completing the ninth grade herself. However, the Children's placement outside of Mother's care continued because of more pressing concerns, namely the sexual abuse.

[22] Prior to A.G. disclosing Father's sexual abuse, Mother witnessed several instances raising suspicion Father was sexually abusing A.G. Once the allegations came to light, DCS implemented a safety plan instructing Mother to complete a domestic violence assessment, among other services, and cease contact with Father; DCS feared if Mother stayed in contact with Father, Mother could not protect the Children.

[23] Initially, Mother ceased contact with Father and participated in services. However, despite Mother having suspicions Father abused A.G. and previously admitting she "knew" Father molested A.G., Mother later stated she did not believe Father molested A.G. Tr. at 146. Thereafter, Mother and Father made contact and Mother continued a relationship with Father, resulting in Mother becoming pregnant with Father's child. Moreover, Mother became resistant to services, did not complete the domestic violence assessment, felt A.G. needed psychiatric treatment because Mother did not believe A.G.'s allegations, and became highly confrontational with A.G. during a therapy session. Fearing for the Children's safety, the juvenile court continued placement of the Children outside of Mother's care and suspended Mother's services, including visitation.

We conclude from this evidence that Mother's conduct indicates a blatant disregard for the safety of her Children, and such conduct subjected the Children to both present and future neglect. Although Father is incarcerated for sexually abusing A.G., we agree with the juvenile court's finding that Father's incarceration "does not resolve the concern of Mother's inability to safeguard her Children's interests and welfare." Appellant's App. at 4. As Brown testified,

> From DCS' standpoint, it would still be putting the children back into a potentially harmful situation. Even if it's not [Father], it could be somebody else that she could allow to come into the home and potentially molest, you know, one of the other children. You know, [S.G.] . . . . So that would always be an ongoing concern the agency would have.

Tr. at 257. In addition, we note there is no evidence in the record indicating Mother would currently be able to protect her Children. Mother's inability to simply cease contact with Father, and unwillingness to complete a domestic violence assessment, is sufficient evidence to show a reasonable probability the conditions leading to the Children's removal will not be remedied.

[25] Second, Mother contends the juvenile court erred in finding continuation of the parent-child relationship posed a threat to the Children's well-being. However, Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires only one element in that subsection be proven to terminate parental rights. *See In re I.A.*, 903 N.E.2d 146, 153 (Ind. Ct. App. 2009). Because we conclude the evidence is sufficient to show a reasonable probability the

conditions resulting in the Children's removal will not be remedied, we need not determine whether the juvenile court erred in concluding continuation of the parent-child relationship posed a threat to the Children's well-being.

[26] Third, Mother contends DCS failed to prove termination of the parent-child relationship was in the Children's best interest. Specifically, Mother argues the Children have a right to maintain a relationship with their Mother, and the Mother has a right to raise her Children. "In determining what is in the best interests of the child," the juvenile court "is required to look beyond the factors identified by the DCS and look to the totality of the evidence." *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009).

> The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Recommendations of the case manager and court-appointed advocate, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests.

*In re A.S.*, 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014) (citations omitted), *trans. denied*.

[27] As noted above, there is sufficient evidence the conditions resulting in the Children's removal will not be remedied. In addition, both Garcia and Ashley Vallangen, one of the Children's therapist, supported termination of Mother's parental rights. Further, we note "[p]ermanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d at 1265. The record reflects the Children suffered from a lack of permanency when under the

care and supervision of Mother; the Children lived in approximately ten to eleven different residences in four different states between 2006 and 2012. In addition, Mother has not had visitation with the Children since December 2012. Moreover, the Children have been placed with Lehmann since September 2013 and are thriving under Lehmann's care and supervision. Garcia testified the Children were in a safe situation with Lehmann and were receiving the services they needed. Vallangen testified the Children finally received a sense of normalcy and stability with Lehmann, and reunification with Mother would affect that stability. We conclude DCS presented clear and convincing evidence from which the juvenile court could conclude termination of Mother's parental rights was in the Children's best interest.

[28] Finally, Mother contends DCS did not have a satisfactory plan for the care and treatment of the Children. Specifically, Mother contends the juvenile court failed to take into consideration her testimony stating that Lehmann had previously been suicidal. Again, we interpret this argument as an attempt to have this court reweigh the evidence and reassess witness credibility, which we will not do. *See In re A.G.*, 2015 WL 6472209, at *2. A satisfactory plan for the care and treatment of a child "need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re D.D.*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), *trans. denied*. At the termination hearing, Garcia testified Lehmann would adopt the Children. As noted above, both Garcia and Vallengen testified Lehmann provided the Children with a safe and stable environment. We

conclude DCS presented clear and convincing evidence from which the juvenile court could conclude DCS had a satisfactory plan for the care and treatment of the Children.

# Conclusion

[29] We reverse a termination of parental rights only upon a showing of clear error. There is no such error here. DCS established by clear and convincing evidence the requisite elements to support the termination of Mother's parental rights. The judgment of the juvenile court terminating Mother's parental rights is affirmed.

[30] Affirmed.

Barnes, J., and Altice, J., concur.