ATTORNEYS FOR APPELLANT
Kimberly A. Jackson
Ruth A. Johnson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

Patrick M. Rhodes
Indianapolis, Indiana



FILED
Jul 10 2014, 2:20 pm

CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

### No. 49S02-1407-JT-458

IN RE THE INVOLUNTARY TERMINATION OF
THE PARENT-CHILD RELATIONSHIP OF K.W.,
A MINOR CHILD, AND HIS MOTHER, C.C.

K.W.,

*Appellant (Respondent below),*

v.

INDIANA DEPARTMENT OF CHILD SERVICES
AND CHILD ADVOCATES, INC.,

*Appellees (Petitioners below).*

Appeal from the Marion Superior Court, No. 49D09-1211-JT-42678
The Honorable Marilyn Moores, Judge
The Honorable Larry Bradley, Magistrate

On Petition to Transfer from the Indiana Court of Appeals, No. 49A02-1305-JT-468

**July 10, 2014**

**David, Justice.**

Court proceedings in which the State seeks to regulate or terminate a parent's relationship with his or her children are among the most delicate and difficult that judicial officers and attorneys must face. And we have repeatedly emphasized the importance of caution and care in these sorts of cases—from all involved—as the repercussions that flow from them can be devastating to every member of a family.

Here, the State sought to terminate the parental rights of a father and mother whose young child had been removed from their care. On the day of the termination hearing, the mother was incarcerated in a local jail and her attorney sought a continuance until after the mother might be released. The trial court denied this request and held the hearing in the mother's absence—the end result was the termination of her parental rights with respect to her son. Under the facts and circumstances of this case, we conclude that the denial of the motion for a continuance was an abuse of discretion.

**Facts and Procedural History**

K.W. was born August 22, 2011. On September 27, 2011, the Department of Child Services alleged that K.W. was a Child in Need of Services. On December 15, 2011, the juvenile court adjudicated K.W. a CHINS. Then on November 1, 2012, after repeated instances in which C.C. and K.W.'s father discontinued services, tested positive for drugs, or were arrested, DCS filed a petition to terminate their parental rights with respect to K.W. After several continuances, a TPR hearing was set for April 22, 2013.

C.C. was incarcerated the day of the hearing, and so her attorney moved for another continuance. C.C.'s counsel stated that C.C. was in the Marion County Jail and had been there for a few weeks, but she anticipated being released on May 1 to work release or home detention. DCS objected, as did the guardian ad litem appointed to represent K.W.'s interests. After a brief exchange, the trial court denied C.C.'s motion and held the TPR hearing with her absent (but still represented by her attorney). On May 1, 2013, it issued an order terminating the parental rights of C.C. and K.W.'s father with respect to K.W.

C.C. appealed, arguing that the juvenile court violated her due process rights when it denied her motion to continue and held the termination hearing without her being present.[1] She also claimed that she received ineffective assistance of counsel because her attorney did not request that she be transported from jail to attend the termination hearing and did not request that C.C. be permitted to participate telephonically.

The Court of Appeals affirmed the juvenile court's denial of C.C.'s motion in an unpublished memorandum decision, concluding that the evidence supporting the termination of her parental rights was overwhelming. In re K.W., C.C. v. Ind. Dep't of Child Servs., No. 49A02-1305-JT-468, 1 N.E.3d 221 at *4 (Ind. Ct. App. Dec. 31, 2013). It also determined that C.C.'s counsel "could have done more to secure [C.C.'s] presence during the hearing, but counsel's performance was not so defective as to warrant a different outcome" in light of the evidence presented at the termination hearing. Id. at *5.

We now grant transfer, thereby vacating the Court of Appeals decision. Ind. Appellate Rule 58(A). Because we find it dispositive, we address only the trial court's denial of C.C.'s request for a continuance.

---

[1] K.W.'s father did not participate in the appeal.

3

**Discussion**

Generally speaking, a trial court's decision to grant or deny a motion to continue is subject to abuse of discretion review. See Rowlett v. Vanderburgh Cnty. Office of Family & Children, 841 N.E.2d 615, 619 (Ind. Ct. App. 2006), trans. denied. "An abuse of discretion may be found in the denial of a motion for a continuance when the moving party has shown good cause for granting the motion," but "no abuse of discretion will be found when the moving party has not demonstrated that he or she was prejudiced by the denial." Id.

But here, C.C.'s motion to continue was specifically aimed at allowing her to attend the TPR hearing upon her release from incarceration. And though we have said that the decision to permit an incarcerated parent to attend a TPR hearing is also within the sound discretion of the trial court judge, the analysis is different and more involved. In re C.G., Z.G. v. Marion Cnty. Dep't of Child Servs., 954 N.E.2d 910, 922 (Ind. 2011). In In re C.G., we adopted the following test to guide the trial court's exercise of discretion when faced with such a question:

> [T]he trial court judge should balance the following factors: (1) [t]he delay resulting from parental attendance; (2) the need for an early determination of the matter; (3) the elapsed time during which the proceeding has been pending; (4) the best interests of the child(ren) in reference to the parent's physical attendance at the termination hearing; (5) the reasonable availablility of the parent's testimony through a means other than his or her attendance at the hearing; (6) the interests of the incarcerated parent in presenting his or her testimony in person rather than by alternate means; (7) the affect of the parent's presence and personal participation in the proceedings upon the probability of his or her ultimate success on the merits; (8) the cost and inconvenience of transporting a parent from his or her place of incarceration to the courtroom; (9) any potential danger or security risk which may accompany the incarcerated parent's transportation to or presence at the proceedings; (10) the inconvenience or detriment to parties or witnesses; and (11) any other relevant factors.

Id. at 922–23 (footnote omitted) (quoting State of W. Va. ex rel. Jeanette H. v. Pancake, 529 S.E.2d 865, 877–78 (W.Va. 2000)). C.C. argues that because the intent of her motion to

4

continue was to allow her, an incarcerated parent, to attend the TPR hearing, this test must be applied.

We disagree. As DCS correctly points out, the test from In re C.G. applies to consideration of a motion to *transport* an incarcerated parent to a TPR hearing—a procedure C.C. did not undertake—and not to a motion to continue the TPR hearing until the parent is no longer incarcerated. As such, application of this test was not compelled for the trial court here.

Nevertheless, we find a number of those eleven factors to be helpful in our review of the trial court's exercise of its discretion. In other words, the factors will help illuminate our review of whether C.C. showed good cause why her motion should be granted or if the denial was otherwise "clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable and actual deductions to be drawn therefrom." Tapia v. State, 753 N.E.2d 581, 585 (Ind. 2001).

As to factor (1), the delay that would result from a continuance until C.C. was released, the hearing was set for April 22 and C.C. believed she would be released on May 1—a span of time perhaps no longer than two weeks, and relatively insignificant given the weight of the interests at stake.[2] And certainly, with respect to factor (2), there is always a *desire* for a speedy determination in the adjudication of parental rights or other parent-child matters. But arguably here, the *need* for a determination two weeks sooner is far less when the child in question was less than two years old and already placed outside the home. As to factor (3), the CHINS proceedings had been filed over eighteen months prior to the TPR hearing date, but the more relevant timeframe is that DCS filed the TPR petition roughly five-and-a-half months prior to the

_____

[2] Clearly if C.C. had not been released by then, or had been reincarcerated again, subsequent analysis of this factor might weigh more heavily against her. Likewise there is no indication in the record of when the next available hearing date would have been—it might have been logistically impossible to reset the proceeding in such a short span of time.

hearing date. This is certainly not a short period of time, but again when dealing with a two-year-old already in preadoptive care it leaves less of an impression.[3]

To the extent C.C.'s presence might provide a more accurate outcome, then absolutely that would enure to K.W.'s best interests. But we have also said that "children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships." In re C.G., 954 N.E.2d at 917. So if the continuance risked an unnecessary delay in K.W.'s adoption, factor (4) would certainly weigh against granting C.C.'s motion. But as we said, the delay here was minimal and K.W. was already out of C.C.'s care and in a preadoptive home. So in this instance, factor (4) does not carry great weight for either side.

Factor (5), the reasonable availability of other means by which a parent could participate in such a proceeding, is a consideration that has arisen in prior cases. In Tillotson v. Clay Cnty. Dept. of Family & Children, 777 N.E.2d 741, 746 (Ind. Ct. App. 2002), trans. denied, the Court of Appeals found no due process violation when two parents—both incarcerated—were denied

---

[3] DCS correctly points out that the Indiana Code provides a 180-day window for a trial court to complete the TPR hearing after a petition to terminate parental rights has been filed—a deadline that here would pass before C.C.'s prospective release from incarceration. Ind. Code § 31-35-2-6(a)(2) (Supp. 2013). It also is correct that failure to meet this 180-day deadline means the trial court, upon motion by a party, "shall dismiss the petition to terminate the parent-child relationship without prejudice." Ind. Code § 31-35-2-6(b). Certainly the trial court was aware of this deadline, as it noted in response to C.C.'s motion that the 180 days would run on April 30.

Three things, however, should keep this statutory framework from weighing against C.C. First, C.C. would have to file such a motion to dismiss—an action we will not presume would occur after her own continuance pushed the hearing over the deadline; and, as we note below, after she did not object to any other continuance sought in the case (including one sought by DCS). Second, this missed deadline would not end the matter as the petition, even if dismissed, would be dismissed without prejudice. DCS could simply file a new petition to terminate C.C.'s parental rights. Third, as we discuss below, the fact that this case was backed up against the statutory deadline is not entirely (or even mostly) C.C.'s fault. Though we do not discount the significance of the family illness that caused DCS to seek an emergency continuance, the fact remains that DCS is at least somewhat accountable for the time crunch present here.

6

requests to be transported to a TPR hearing. But at the same time, it cautioned that "in future cases, trial courts would be well advised to fully consider alternative procedures by which an incarcerated parent could meaningfully participate in the termination hearing when the parent cannot be physically present." Id. These alternatives might conceivably include "using a speaker phone at the hearing or continuing the hearing after the State has presented its case and allowing the parent time to review a transcript or audio tape of the hearing and then respond to allegations raised by the State's witnesses." Id. at n.7; see also In re C.G., 954 N.E.2d at 920 (citing Tillotson and noting that incarcerated parent participated in proceeding telephonically).

We recognize that C.C.'s counsel at the TPR proceeding did not make a specific request to have C.C. participate telephonically or by video teleconference in lieu of a continuance. Certainly DCS knew this was an alternative, as it filed a motion—that the trial court granted—to have two of its out-of-state witnesses testify telephonically. This would have been the best practice for C.C.'s counsel to at least attempt to pursue, and we do not encourage attorneys in the future to ignore it in TPR proceedings—or not proactively pursue it in advance of the hearing. See Tillotson, 777 N.E.2d at 745–46 (incarcerated parents filed motions for transport but did not seek alternative procedures until "eleventh-hour request," by which point "no arrangements had been made with the prisons or the court" and request "clearly would have resulted in delay"). Here the record does not reflect when C.C.'s counsel learned of C.C.'s incarceration, but we think only an eleventh-hour discovery of a client's inability to attend such a hearing would justify not bringing the matter to the trial court's attention sooner.

But nevertheless, and without needing to explore the extent to which this failure rendered that attorney's performance deficient or ineffective, we note that here those alternative methods were reasonably and readily available—and already being used for other witnesses in the same proceeding. Had the trial court indicated its willingness to postpone the hearing a few hours or a few days in order to allow C.C. to participate via telephone, and had C.C.'s counsel refused such

7

a compromise and insisted on a continuance until C.C could be physically present, this might have weighed in favor of the judge's action in this case and against C.C. But no such alternative was suggested by the trial court or by DCS.[4]

Factor (6) is related, in that it addresses the incarcerated parent's interest in presenting testimony in person rather than through alternative means. But as we said, there were no alternative means proposed or suggested though they were readily available. So when considering this factor, we must be cognizant of the fact that here it actually represents the choice between presenting testimony in person and not presenting testimony at all. When viewed that way, it certainly weighs heavily in C.C.'s favor.

And to be sure, with respect to factor (7) there is significant value in a parent's personal participation in the proceedings—whether it ultimately sways the outcome or not. Even when a parent participates by teleconference, we have noted the difficulties presented in that "trial judges are in the best place to assess witness credibility, and by not having a parent present at a termination hearing, a trial judge is not as easily able to ascertain the credibility of a witness over the phone." In re C.G., 954 N.E.2d at 920. These challenges are obviously exacerbated when the parent does not participate in the proceeding at all. Certainly all reasonable efforts should be made to ensure that parents are present during a life- and family-altering event.

---

[4] And notwithstanding the fact that C.C. could not attend the hearing because of her own actions leading to her incarceration, we do not see this as an instance in which a party has engaged in "willful, knowing, and voluntary misconduct aimed at manipulating the court system for one's own benefit" so as to justify an in absentia trial. Hawkins v. State, 982 N.E.2d 997, 1000 (Ind. 2013). We do not intend to excuse whatever misconduct constituted her probation violation, but the punishment for that misconduct was spending time in jail—and C.C. was paying that price. We cannot also tack on as an additional punitive measure that C.C. should simply accept being omitted from a court proceeding challenging her right to be a parent to her child.

It is true that the record shows that C.C. was in and out of jail, and in and out of services, throughout the pendency of the CHINS and TPR proceedings. Neither of those trends bodes well for maintaining one's parental rights. And the record also shows that C.C.'s counsel aptly cross-examined DCS's witnesses and presented brief testimony from C.C.'s mother concerning C.C.'s intent in the adoption process. But regardless, these efforts fall well short of telling C.C.'s side of the story or presenting her explanations for the events DCS outlined.

In this particular case, factors (8) and (9) are less relevant to our review as C.C. was not seeking transport to the courtroom; she was seeking a continuance to enable her to attend at a later date. But we have commented in the past about the relatively low cost and complexity of transporting incarcerated parents within Marion County. Id. at 921 (acknowledging "the potential significant cost of transporting Mother from Henderson, Kentucky, to Indianapolis, Indiana," for TPR hearing, but noting "our analysis may have been different had Mother been across town in the Marion County Jail"). And we also recognize that in some cases there may be valid security concerns or dangers presented by transporting an incarcerated parent to a TPR hearing. But here there is no indication that, for example, the TPR proceedings are based in any way on C.C. abusing K.W.—such that C.C.'s presence in proximity to K.W. would be undesirable—or that C.C. presents some sort of general threat or menace to others, such that allowing her out of the strict confines of incarceration would be unsafe to the community as a whole.

We also recognize that even a two-week continuance would be an inconvenience on the trial court, the attorneys, the witnesses, and others participating in the hearing. But at the same time, the impact on the witnesses furthest from the courtroom—DCS's out-of-state witnesses— would be mitigated as those two individuals were already testifying telephonically. So to the extent factor (10) looks at the inconvenience of parties or witnesses, we know that such an inconvenience would be present. But it would be no greater than would otherwise occur from any continuance.

Moreover, here the hearing had already been continued twice—and only once (and then only partially) at C.C.'s request. The TPR hearing was initially set for January 25, 2013. At a pre-trial hearing on January 17, 2013, C.C. and K.W.'s father (separately) requested a continuance. It is not clear from the record what C.C.'s grounds for requesting the continuance were, but the trial court noted that she was not incarcerated and was participating in services at the time. K.W.'s father, however, requested the continuance as he was at that time incarcerated in Hendricks County and set to be released the following week—but would then be transferred to the Marion County Jail on an open warrant there. Both DCS and K.W.'s guardian ad litem objected to the requests, but the trial court continued the TPR hearing until March 12.

Then on March 11, DCS's attorney filed an emergency motion for a continuance because of a family illness that would prevent her from being in court the next day, and she was unable to obtain substitute counsel on such short notice. Neither C.C. nor K.W.'s father objected to this request, and the trial court reset the TPR hearing for April 22. Thus, any inconvenience here would have been slight—and certainly not the only time it would have occurred in the course of the proceeding.

In sum, we find that the delay that would have resulted from the continuance could have been as short as two weeks. This would have been a minimal inconvenience to all others involved, although we recognize that the record does not indicate that the courtroom, staff, parties, and witnesses would have been available on such notice; neither is it a certainty that C.C. would have been released from incarceration. But at the same time, this proceeding had not been overly drawn-out or delayed, and in fact the proceeding had been held up at DCS's request for nearly as long as it had been delayed as a result of C.C.'s prior motion.

Moreover, despite the desire for finality in these sorts of cases and the wish to mitigate any additional unnecessary stress that prolonging such a proceeding can place on a child, this is not a case where there is an overwhelming sense of urgency. K.W. was two years old and he is not, for example, trying to enroll in school or another activity that is time-sensitive. And he is

not at risk of physical or emotional abuse as a result of any delay; he is already in preadoptive care and is, by all accounts, quite healthy and doing well.

And we also find that C.C. had a substantially significant interest in being present at the proceeding. While her counsel certainly could have—and probably should have—already pursued alternative approaches to satisfy this interest, such as a motion to transport C.C. to the courtroom or a request to have her participate telephonically, by the time C.C.'s motion to continue was made the trial court was presented only one choice: continue the trial (i.e., allow C.C. to be present or use an alternative method) or proceed without her voice being heard at all.

So rather than continue the TPR proceeding a short time until C.C.'s release date, or to accommodate a readily available alternative means for her to present testimony, the trial court opted to carry out a proceeding by which C.C.'s fundamental rights to parental autonomy were challenged, attacked, and taken away—without C.C.'s personal participation in any way. When viewed in such a light, we cannot help but find that C.C. showed good cause why her motion should be granted, and to do otherwise was clearly against the logic and circumstances of the case.

But as we said above, it also true that no abuse of discretion will be found in the denial of a motion to continue if the movant was not prejudiced as a result. See Rowlett, 841 N.E.2d at 619. DCS argues extensively about how C.C.'s presence would not have impacted the ultimate result of the trial, in the context of analyzing factor (7) of the In re C.G. test. And the Court of Appeals viewed the matter in a similar fashion. See In re K.W., 1 N.E.3d 221 at *4. But under the circumstances of this case, we do not think that the notion of prejudice can be viewed that narrowly or parallel a harmless error analysis. The harm here was more than merely the additional weight C.C.'s personal participation might have carried at the hearing.

Even though there is no absolute constitutional right for a parent to be present at a termination hearing, In re C.G., 954 N.E.2d at 921, this does not invariably correlate to a conclusion that it is permissible to omit the parent from participating in the process entirely.

11

"[T]he involuntary termination of parental rights is an extreme measure that is designed to be used as a last resort when all other reasonable efforts have failed," and the State may only undertake this measure in a manner that comports with the standards of due process. Id. at 916–17. So "[i]f anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs." Id. at 917 (quoting Santosky v. Kramer, 455 U.S. 745, 753–54 (1982)).

Thus, though a parent may not have an absolute right to be *present* at a TPR hearing, "such parent does have the right to be heard at a meaningful time and in a meaningful manner." Tillotson, 777 N.E.2d at 745. This in fact is the essence—and the aim—of the entire concept of Due Process. See In re C.G., 954 N.E.2d at 917. And here, in a proceeding challenging her fitness as a parent to her child, C.C. was not heard at *any* time or in *any* manner.

C.C. was not physically present, nor was an effort made to bring her to the courtroom. No attempt was made to secure her participation by readily available means like telephone or video. And no other form of statements from her, such as deposition transcripts or affidavits, were introduced into evidence or otherwise put before the trial court. So while it is true that C.C.'s attorney attempted to mount a defense by cross-examining DCS witnesses and putting on one of his own, that is a far cry from saying that C.C. was heard at a meaningful time and in a meaningful manner and far from being fundamentally fair—and it was therefore prejudicial.

## Conclusion

Under the facts and circumstances of this case, we conclude that the trial court here abused its discretion by denying C.C.'s motion to continue the TPR hearing and proceeding instead without her participation. We therefore vacate that portion of the trial court's order terminating C.C.'s parental rights with respect to her son, K.W.

Dickson, C.J., Rucker, Massa, and Rush, JJ., concur.

12