## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 22 2016, 8:41 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Megan Shipley
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Attorneys General of Indiana
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

M.M. *(Minor Child)*,

and

S.M. *(Mother)*,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

December 22, 2016

Court of Appeals Case No.
49A02-1605-JT-1028

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

The Honorable Larry E. Bradley, Magistrate

Trial Court Cause No.
49D09-1507-JT-467

**Robb, Judge.**

# Case Summary and Issues

[1] S.M. ("Mother") appeals the juvenile court's termination of her parental rights to her two-year-old son, M.M, raising a sole restated issue: whether the juvenile court's termination order is supported by clear and convincing evidence. Concluding the termination order is not clearly erroneous, we affirm.

# Facts and Procedural History

[2] Mother has two children: T.B. and M.M. Prior to M.M.'s birth, the Indiana Department of Child Services ("DCS") received a report of domestic violence between Mother and T.B.'s father and filed a petition alleging T.B. was a child in need of services ("CHINS"). During this CHINS proceeding, Mother informed her therapist she was "thinking about harming [T.B.] as she felt her life would be significantly easier if she did not have to deal with her daughter[,] [T.B.]" DCS Exhibit 20. In February 2013, DCS referred Mother to psychologist Danielle Nance for a psychological evaluation.[1] Nance concluded Mother suffers from cognitive delay due to a low intelligence quotient, post-traumatic stress disorder, and depression.[2] Nance recommended Mother manage her depression symptoms through medication and counseling, but warned

---

[1] In October 2012, Mother was hospitalized for depression for seventy-two hours.

[2] Given Mother's cognitive delay, Nance concluded Mother will struggle to manage her own mental health issues, her ability to parent, and will require some assistance and supervision in her day-to-day living.

> [Mother] is an individual with developmental and cognitive delays that continue to present as risk variables to her safe day to day living. There are certainly parenting risks present due to her cognitive delays. While individuals with mild cognitive handicaps can be in a parenting role, this is very difficult and may not be safe without direct support, oversight and assistance.

*Id*. Mother also became pregnant with M.M. shortly after her psychological evaluation and DCS worked with Mother in preparation for M.M.'s birth.

[3] In December 2013 and shortly before the birth of M.M., DCS became concerned with whether Mother was prepared for the birth of M.M. due to reports of domestic violence between Mother and M.M.'s father ("Father") and Mother's inability to find suitable housing. Following M.M.'s birth, DCS filed a petition alleging M.M. was a CHINS. Thereafter, Mother and Father entered into a safety plan under which M.M. was to remain in Mother's care and Father was to receive supervised visitation. In March 2014, the juvenile court adjudicated M.M. as a CHINS, citing T.B.'s CHINS adjudication,[3] instances of domestic violence, and Mother's mental health issues. Further, the juvenile court ordered Mother to participate in reunification services; Mother was to participate in a homebased counseling program, complete a psychological evaluation and follow any recommendations, and complete a domestic violence assessment and follow any recommendations. At some point, Mother violated the safety plan by allowing Father to have unsupervised visitation with M.M.

---

[3] Ultimately, the juvenile court adjudicated T.B. as a CHINS and awarded custody to T.B.'s father.

On July 15, 2014, DCS removed M.M. from Mother due to Mother violating the safety plan and the dirty condition of her residence.

[4] Following M.M.'s removal, Mother had supervised visitation with M.M. During these visits, Mother struggled to interact with M.M. In addition, Mother was inattentive and was often on her cell phone to the extent she was not able to fully supervise M.M. nor take "full advantage" of the visitation time. Transcript at 19. Mother sometimes did not have food to feed M.M. during visits, forcing Mother to contact family members or friends to provide money to purchase food for M.M. Outside of visitation, Mother moved residences on at least seven different occasions, and at times, found herself homeless. When Mother did have housing, the housing was "often very dirty, trash on the floor, trash in the kitchen, food on the floor, on surfaces . . . sex items out for general viewing." *Id*. at 76.

[5] On July 8, 2015, DCS filed a petition to terminate Mother's parental rights and the juvenile court scheduled an evidentiary hearing. At the hearing, DCS Family Case Manager Sonja Parker testified Mother has lived in many different residences in a short period of time and most of those homes were not suitable to raise a child. Parker did opine M.M.'s uncle's two-bedroom apartment, where Mother currently resides, is cleaner than Mother's previous residences, but noted concern there was only a six-month lease on the apartment and approximately twelve people live in the apartment. As to Mother's financial stability, Parker testified Mother does not have a job and is limited to her social security income. Even after DCS removed M.M. from Mother's care, Mother

struggled to make do, "leaving her without food and . . . times without being able to pay her portion of the rent that she has with her roommates." *Id*. at 24. Despite DCS encouraging Mother to seek employment, Mother did not intend to seek employment, claiming her social security income was sufficient. Parker concluded Mother would further struggle with the added expenses of caring for M.M. and opined Mother's parental rights should be terminated. On cross-examination, Parker emphasized Mother's instability, inability to financially secure and care for herself, and dependency on others were all major concerns DCS has had with Mother "for the entire life of the case." *Id*. at 43.

[6] Ashley Douthitt, Mother's home-based case manager, opined Mother has not made enough progress to be unified with M.M. Douthitt opined Mother's residence was not suitable for M.M. given the fact the home only has two bedrooms and "about twelve people" live in the home. *Id*. at 54. As to Mother's financial instability, Douthitt stated Mother "does struggle with kind of providing for just basic needs for herself sometimes[,]" explaining Mother struggles to manage money and often relies on others to provide financial assistance. *Id.* at 55. Lastly, Douthitt noted she has encouraged Mother to take medication to treat her mental health issues, but Mother has not done so.

[7] Erika Forslund, also Mother's home-based case manager for some time, testified she worked with Mother in an attempt to stabilize Mother's financial and housing issues. Due to Mother's low income and a previous eviction, Mother struggled to find a residence. Forslund encouraged Mother to budget in order to save money so Mother could pay a deposit on a new residence, but

Mother was "often untruthful about where her money was going or unable to say where it was going so budgeting really never panned out in order to find somewhere." *Id*. at 77. Given Mother's inability to budget, find suitable housing, and feed herself, Forslund opined Mother had not shown she could care for herself nor M.M.

[8] Sara Bucksten, Mother's home-based case therapist, met with Mother and diagnosed her with "major" depression. *Id*. at 97. Bucksten testified Mother's depression impedes her daily functioning, her ability to finish tasks, and her ability to parent a child. Specifically, Bucksten explained Mother struggles to care for herself, let alone a child. Bucksten also noted Mother is not taking necessary steps to treat her depression and recommended M.M. not return to Mother's care, claiming Mother has made only "minimal progress." *Id*. at 104.

[9] Following the evidentiary hearing, the juvenile court issued an order terminating Mother's parental rights, finding in relevant part,

> 2. The parental rights of [M.M.'s] father were terminated on November 20, 2015.
> * * *
> 4. At the time [M.M.'s] CHINS case was filed, [Mother] was involved [in] another CHINS case with her daughter [T.B.] that had been pending since October 2012. That case was closed on February 2, 2016, with custody of [T.B.] being awarded to the child's father.
> 5. On March 4, 2014, [M.M.] was found to be in need of services after [Mother] admitted to there being a pending CHINS case on [M.M.'s] half-sibling, and that there is a history of domestic violence and mental health issues for which she was undergoing ongoing treatment.

\* \* \*

7. In July 2014, [M.M.] was detained outside the home after his safety plan was violated.

\* \* \*

10. Due to having minimal Social Security Supplemental Income of $733.00, [Mother] had a hard time meeting her basic needs of stable housing and food.

11. [Mother] relies on others, mainly her mother, as a support system to help meet her needs.

12. [Mother] has no intention of obtaining employment to supplement her disability.

13. [Mother] lived at several addresses during the CHINS case, living with friends and relatives and was sometimes homeless.

14. Making it harder to obtain appropriate housing was [Mother's] lack of budgeting for a deposit and having evictions on her records.

15. [Mother] currently lives in a two bedroom home with her brother and his girlfriend. This home is inappropriate for a small child because of the ten to twelve other people who reside there.

16. Past residences where [Mother] lived by herself where [sic] found to be cluttered, dirty, and trashy.

17. Home based case management was referred to address housing, income, and budgeting issues. Although [Mother] participated in case management services from September 2014 to the time of this trial, she has not made enough progress to reunify with [M.M.]

18. A major concern for [Mother's] ability to safely parent is her failure to follow up on recommendations to treat her major depression diagnosis. [Mother] refuses to take medication as [she] did not like the way prior depression medication made her feel.

19. [Mother] has also been diagnosed with Post Traumatic Stress Disorder and anxiety.

20. [Mother] is functioning within the extremely low range of intelligence. Most people in this range of cognitive delay need assistance and supervision in their daily life and parenting responsibilities.

21. Depressive symptoms experienced by [Mother] includes [sic] having no energy or motivation, sleeping a lot, and feeling a lack of worth or having a purpose.

22. Due to her daily struggle with self-care, the home based therapist who has seen [Mother] since November 2014 cannot recommend [M.M.] be returned to her care, feeling [Mother] has made minimal progress.

23. Participation in services is not the issue here, but that [Mother] has struggled from the beginning to care for herself.

24. [Mother] has made progress with parenting skills since parenting time began which was then strained and stressful for [M.M.] and his mother. However, [M.M.] is still resistant to his mother's affection and will not allow her to pick him up.

* * *

26. Continuation of the parent-child relationship poses a threat to [M.M.'s] well-being. Without successfully addressing safety and neglect issues of instability and untreated mental health, [Mother] cannot provide a safe and stable home. Service providers and the family case manager all see [Mother] struggling to meet her own needs. She would not be able to meet [M.M.'s] needs.

27. There is a reasonable probability that the conditions that resulted in [M.M.'s] removal and continued placement outside the home will not be remedied by his mother. [Mother] has been involved in services in [M.M.'s] case alone for two years and she has not progressed to the point where she has unsupervised parenting time. Given her refusal to supplement income, adequately treat her depression, and be able to overcome cognitive delays, [Mother] will not be able to overcome conditions.

Appellant's Appendix at 19-20. Mother now appeals.

# Discussion and Decision

# I. Standard of Review

When we review a termination of parental rights, we neither weigh the evidence nor judge witness credibility, *In re C.G.*, 954 N.E.2d 910, 923 (Ind. 2011), and we consider only the evidence and reasonable inferences most favorable to the judgment, *S.L. v. Indiana Dep't of Child Servs.*, 997 N.E.2d 1114, 1123 (Ind. Ct. App. 2013). As required by statute, the juvenile court entered findings of fact and conclusions. *See* Ind. Code § 31-35-2-8(c). We therefore apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. *In re C.G.*, 954 N.E.2d at 923. "We will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. Clear error is that which leaves us with a definite and firm conviction that a mistake has been made." *S.L.*, 997 N.E.2d at 1123 (citation omitted)

# II. Termination Order

Mother contends the juvenile court's termination order is clearly erroneous.[4] Specifically, she claims DCS failed to present clear and convincing evidence to establish there is a reasonable probability the conditions resulting in M.M.'s removal will not be remedied and there is a reasonable probability the

---

[4] Except for finding number twenty-seven, we note Mother does not challenge any findings of fact and we therefore accept those as true. *See In re B.R..*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007), *trans. denied*.

continuation of the parent-child relationship poses a threat to M.M's well-being. We disagree.

[12]    "[T]he involuntary termination of parental rights is an extreme measure that is designed to be used as a last resort when all other reasonable efforts have failed . . . ." *In re K.W.*, 12 N.E.3d 241, 249 (Ind. 2014) (alteration in original) (citation omitted). Indiana Code section 31-35-2-4(b)(2) sets forth what must be proven in order to terminate parental rights, which we quote in relevant part:

> (B) that one (1) of the following is true:
>     (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>     (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

The State must prove each element by clear and convincing evidence. Ind. Code § 31-34-12-2; *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009). If a juvenile court determines that the allegations of the petition are true, then the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[13]    "In determining whether the conditions that led to a child's removal will not be remedied," the juvenile court "must judge a parent's fitness to care for her child at the time of the termination hearing and take into consideration evidence of changed conditions." *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). "[I]t is not just the basis for the initial removal of the child that may be

considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. The juvenile court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *In re A.B.*, 924 N.E.2d at 670 (citation omitted). The juvenile court may also consider the services the State offered to the parent and the parent's response to such services. *Id*.

[14] The record establishes DCS initially became concerned for M.M.'s well-being due to Mother's lack of appropriate housing, Mother's untreated mental health issues, and instances of domestic violence. The record further establishes M.M. was initially removed from Mother's care because Mother violated the safety plan and could not keep her home safe and clean. The juvenile court then continued M.M.'s removal as DCS continued to be concerned with Mother's housing instability, inability to financially secure and care for herself, and her dependency on others. In maintaining DCS did not meet its burden, Mother argues the juvenile court's findings as to her income, mental health issues, and cognitive delay—each viewed independently—do not support the conclusion there is a reasonable probability the conditions leading to M.M.'s removal will not be remedied. Although Mother may be correct the juvenile court's findings as to her income, for example, are alone insufficient to support terminating her parental rights, we note the record speaks to much more than her financial

instability and inability to properly budget.[5] Specifically, the record establishes Mother made minimal progress in therapy, Mother did not oblige numerous requests she appropriately address her mental health issues, Mother ignored DCS' request to seek employment, and Mother could not secure suitable and safe housing for M.M. In taking all of the juvenile court's findings under consideration, the findings establish Mother has failed to take necessary steps to care for herself—a concern DCS has had "for the entire life of the case"—and remedy the conditions leading to M.M.'s removal. Tr. at 43. We conclude DCS presented sufficient evidence to show a reasonable probability the conditions leading to M.M.'s removal or to his continued placement outside the home will not be remedied.[6]

# Conclusion

---

[5] To the extent Mother argues the evidence does not support the juvenile court's finding number twenty-seven, we note such an argument invites us to reweigh the evidence and reassess witness credibility, which we will not do. *In re G.Y.*, 904 N.E.2d at 1260. We note, however, Mother seems to argue DCS did not present evidence Mother could even seek employment in light of her mental health issues and cognitive delay. Even assuming Mother was in a condition to be employed, Mother's ability to budget would be essential to her own, and M.M.'s, well-being and DCS presented evidence of Mother's inability to properly budget.

[6] Mother also contends the juvenile court erred in finding continuation of the parent-child relationship posed a threat to M.M.'s well-being. However, Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires only one element in that subsection be proven to support termination of parental rights. *See In re I.A.*, 903 N.E.2d 146, 153 (Ind. Ct. App. 2009). Because we conclude the evidence is sufficient to show a reasonable probability the conditions resulting in M.M.'s removal will not be remedied, we need not also determine whether the juvenile court erred in concluding continuation of the parent-child relationship posed a threat to M.M.'s well-being.

[15] DCS established by clear and convincing evidence the elements necessary to support the termination of Mother's parental rights. The judgment of the juvenile court terminating Mother's parental rights is affirmed.

[16] Affirmed.

Mathias, J., and Brown, J., concur.