

IN THE

# Court of Appeals of Indiana

In re the Termination of the Parent-Child Relationship of
A.R., R.R., and C.R. (Minor Children), and
J.R. (Mother) and R.R. (Father),

*Appellants-Respondents*



FILED

Oct 23 2025, 10:02 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

October 23, 2025

Court of Appeals Case No.
25A-JT-917

Appeal from the Clark Circuit Court

The Honorable Lisa Reger, Judge
The Honorable Susan L. Orth, Senior Judge

Trial Court Cause No.
10C04-2411-JT-62
10C04-2411-JT-63
10C04-2411-JT-64

**DeBoer, Judge.**

## Case Summary

[1] J.R. (Mother) and R.R. (Father) (collectively, Parents) jointly appeal the trial court's order terminating their parental rights to A.R., R.R., and C.R. (collectively, the children). Without challenging any substantive findings of fact or conclusions of law, Parents argue that the trial court abused its discretion when it denied their attorneys' motions to continue the termination fact-finding hearing and proceeded with the hearing in Parents' absence. They also argue that a party petitioning to terminate the parent-child relationship should be required to use heightened methods of service when sending statutory notice of the termination hearing to interested parties under Indiana Code section 31-35-2-6.5, and that, in this case, the Indiana Department of Child Services (DCS) did not present sufficient evidence that Parents were properly notified of the hearing. We affirm.

## Facts and Procedural History

[2] Parents have three children: A.R., born October 28, 2015; R.R., born March 15, 2018; and C.R., born January 15, 2021.

[3]     On December 1, 2021, DCS received a report that the children were being neglected by Parents.[1]  The report alleged that Parents used drugs, engaged in domestic violence in front of the children, and were not meeting the children's basic needs.  A week later, DCS family case manager (FCM) Jamila Smith made an unannounced visit to the family's home and, after multiple knocks on the door, the two eldest children answered the door.  After FCM Smith asked the children to get their parents, A.R. told her that Father "was sleeping on the [kitchen] floor."  Exhibits Vol. 3 at 33. FCM Smith yelled for Parents but could not get their attention.  Law enforcement and emergency medical services came to the home and found Father unresponsive on the kitchen floor and Mother sleeping upstairs.  Mother, who appeared "impaired and confused" and had a swollen, bloodied lip, told FCM Smith that the Christmas tree had fallen on her.  *Id.* at 33.  Father also looked impaired and told FCM Smith that Mother had hit him over the head while he was feeding the children and knocked him out.  The home was a mess with clothes, broken furniture, toys, and trash "scattered throughout the home."  Transcript at 18.

[4]     Based on these circumstances, DCS detained the children and Parents were arrested and charged with multiple felony and misdemeanor counts of neglect of a dependent.  In September 2022, Mother pled guilty to two counts of felony neglect of a dependent.  The court entered judgment of convictions as

---

[1] Parents and A.R. had prior involvement with Indiana's child welfare system.  In 2012, Father had his parental rights to three children terminated, none of whom were Mother's children.  A.R. was adjudicated a CHINS in 2016 but was successfully reunified with Parents the next year.

misdemeanors and sentenced her to consecutive one-year suspended terms. The charges against Father were ultimately dismissed.

[5] A few days after the December 2021 events, DCS petitioned to adjudicate the children as children in need of services (CHINS). The trial court did so in May 2022. Between these adjudications and the July dispositional hearing, A.R. had two trial home visits (THV), one with Mother and one with Father, both of which were unsuccessful due to Parents' actions.[2] The court held a dispositional hearing in July and later entered its order requiring Parents to participate in standard dispositional services, terminating Father's THV, and suspending Parents' visitation.

[6] At an October review hearing, the court found that Mother had partially complied with the children's case plan and engaged in some services. Father was noncompliant. The court reinstated Mother's visitation with the children but declined to do so for Father. At a December permanency hearing, the court found that A.R. was in a residential placement for diagnostic testing. Later, she was diagnosed with an intellectual disability. R.R. and C.R. were living in foster homes and both were found to be progressing well. Parents "ha[d]

---

[2] DCS suggests that A.R.'s THV with Father was unsuccessful because he "allowed her to go with" Mother who was then arrested for operating a vehicle while intoxicated (OVWI) with A.R. in the car. Tr. at 23; *see* Appellee's Br. at 9. However, to support these facts, DCS cites to an exhibit showing the chronological case summary of an *October 2023* charge Mother received for OVWI endangering a person. *See* Ex. Vol. 3 at 112-13. This is all to say that the timeline of these events is unclear because there are discrepancies between the apparent time of the THV and the date this offense was charged. Nevertheless, any confusion about the timing of this THV or the reason it was deemed unsuccessful does not bear on our decision.

started cooperating with service providers and DCS" and were "mak[ing] progress toward reaching the goal of reunification." Ex. Vol. 3 at 65. The court noted similar progress and compliance at a March 2023 review hearing.

[7] But in June 2023, Mother stabbed Father with a knife and was charged with two counts of felony domestic battery. In October, she pled guilty to Level 6 felony domestic battery resulting in moderate bodily injury and was sentenced to 540 days on community corrections. However, in December, the court revoked her placement on community corrections and ordered her to serve 180 days in jail. Mother was also charged with felony operating a vehicle while intoxicated (OVWI) endangering a person and misdemeanor invasion of privacy for violating a protective order near the end of 2023. She later pled guilty to misdemeanor OVWI with no endangerment and misdemeanor invasion of privacy and received suspended sentences in each case.

[8] Meanwhile, in October 2023, the trial court found Father in contempt of court for willfully failing to comply with court-ordered drug screening, therapy, and "not engag[ing] with his children appropriately during therapeutic visits." *Id.* at 67. The court also changed the children's permanency plan from reunification to adoption, noting Parents' noncompliance with the case plan, Father's contempt, Mother's incarceration, and Parents' inability "to provide a stable and safe home environment for the children." *Id.* at 69.

[9] At a December 2023 permanency hearing, the trial court noted that R.R. had been briefly placed on a THV. The THV ended unsuccessfully after another

domestic violence incident occurred between parents. R.R was returned to the same foster home he had lived in before the THV, but the court found that he was not progressing well due to the disruptive nature of the failed THV and because his autism made change difficult for him. The court found that "[a]ll three children ha[d] high level needs" and needed stability, which Parents had been unable or unwilling to provide. *Id.* at 75. Although it noted that Mother had applied for services while in jail and Father had enrolled in a drug rehabilitation program, the court affirmed adoption as the permanency plan for all three children.

[10] Over the course of DCS's involvement, Parents consistently failed to submit to drug screens and tested positive for illegal substances. Mother tested positive for methamphetamine as well as various unprescribed substances. Father tested positive for fentanyl, THC, cocaine, and other unprescribed substances. Parents were still noncompliant with drug screening in the months leading up to the February 27, 2025 termination fact-finding hearing, and service providers believed Parents had not addressed their substance use issues.

[11] In the summer of 2023, DCS referred Father to medication management services after it determined that the way he was combining his Xanax and Suboxone prescriptions was leading to impairment. However, he did not follow the medical provider's recommendation to stop taking these medications together.

[12]     For three years before their termination hearing, Parents participated in Family Recovery Court (FRC) to address their substance use issues. The program facilitated various services, including case management, recovery support, random drug screens, and transportation support. At the time of the termination hearing, neither Parent had successfully completed the program. Mother was administratively discharged from FRC in September 2024 because she was incarcerated. She was permitted to re-enroll, but she only ever achieved "very brief" compliance with FRC while she participated before she went into an inpatient facility in January 2025. Tr. at 57. Father was discharged from FRC in September 2024 after being "extremely combative, argumentative[,] and disrespectful to court staff." *Id.* at 59. He was noncompliant with program services and, on one occasion, attempted to tamper with a drug screen. The FRC program coordinator believed Parents were not safe and appropriate caregivers for the children because of unremedied issues with substance use and domestic violence.

[13]     At an August 2024 review hearing, the trial court suspended Father's visitation because the police had been contacted in response to Father's aggressive behavior during visits with the children, he was not participating in parenting classes or submitting to drug screens, and he had been charged with misdemeanor theft and criminal mischief. Following an October hearing, the court reaffirmed the children's permanency plan of adoption, noting Parents' lack of compliance with FRC, drug screening, and therapy.

[14]     On November 13, DCS filed petitions to terminate Parents' parental rights to all three children. Parents appeared at the November 19 initial hearing. Father said he was going to hire private counsel, and Mother requested and was appointed a public defender. The trial court set a status conference to ensure Father secured counsel and set the fact-finding hearing for January 2, 2025. Parents acknowledged that the court could proceed with the case in their absence if they "fail[ed] to appear for the fact-finding hearing[.]" *Id.* at 12.

[15]     Mother's attorney entered an appearance on December 10. At the December 19 status conference, Father reported that he had not secured counsel and requested more time to do so. The trial court granted his request and modified the fact-finding hearing setting to a status conference that date. Despite Father's failure to appear for the January 2, 2025 status conference, the court appointed him an attorney and reset the fact-finding hearing for February 27. Father's attorney filed an appearance on January 15. Notably, Father's attorney in the termination proceeding had represented him in the CHINS proceeding since August 2023. Mother's attorney had represented her since September 2023.

[16]     On January 21, DCS formally notified the court that it had complied with its statutory notice obligations by informing the parties that the fact-finding hearing on DCS's petitions to terminate parental rights would be held on February 27, 2025 at 1:30 P.M in the Clark Circuit Court (address provided). The certificate of service with the filing certifies that the notice was served upon both Parents at an address in Charlestown, Indiana.

[17] Parents failed to appear for the February 27 fact-finding hearing, but their attorneys were present. At the beginning of the hearing, the trial court noted that Parents were ten minutes late and asked the attorneys how they wanted to proceed. Counsel for DCS stated, "I would ask to go forward today on this. We've already had this hearing set, and then it was continued. They have been properly notified of the hearing. I did file the 10-day notice to them, so they were made aware of today's date." *Id.* at 14. Father's attorney requested a continuance, simply noting that his client was not present. Mother's attorney joined that motion without explanation. Over the objections of Parents' attorneys, the court proceeded with the fact-finding hearing in Parents' absence, reasoning that the matter "ha[d] already been continued once[,] . . . notice was sent to both parties[,] . . . and we have waited, and they aren't here." *Id.*

[18] In addition to the evidence set out above, Parents had each obtained new criminal charges in the weeks before the fact-finding hearing, and Father had pending warrants in separate criminal cases.

[19] At the time of the fact-finding hearing, the children were in separate foster homes. A.R. and C.R. had bonded with and were thriving in the homes of their respective pre-adoptive foster parents during the years they had been living with them. R.R. was in a new placement that was not pre-adoptive, and DCS continued to look for an adoptive home for him. The children's FCM and court-appointed special advocate testified that termination of parental rights was in the children's best interests and both providers indicated that the reasons

for the children's removal had not been remedied. A.R.'s therapist also testified that it was not in A.R.'s interest to return to Parents' care.

[20] The trial court granted DCS's petition on the record at the end of hearing. On March 17, it entered an order terminating Parents' parental rights to the children which included extensive findings of fact and conclusions of law. Parents now jointly appeal.

## Discussion and Decision

[21] On appeal, Parents do not challenge any of the trial court's substantive findings and conclusions supporting its order involuntarily terminating their parental rights to the children.[3] Instead, Parents challenge the trial court's decision to deny their attorneys' day-of-hearing motions to continue the fact-finding hearing. They separately argue that heightened methods of service and evidence of compliance should be required under Indiana Code section 31-35-2-6.5 given the gravity of proceedings to involuntarily terminate parental rights, and DCS did not prove Parents were properly notified in this case. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000) ("[T]he interest of parents in the care, custody, and control of their children [] is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme Court].").

---

[3] Parents do challenge the trial court's procedural finding that they were properly notified of the fact-finding hearing.

## 1. Continuance and Due Process

[22] Parents argue that the trial court's denial of their motions to continue the termination fact-finding hearing "was an abuse of discretion that trampled on their due process rights." Appellants' Brief at 15. A court's ruling on a motion to continue is generally subject to review for an abuse of discretion. *In re K.W.*, 12 N.E.3d 241, 243-44 (Ind. 2014). "'An abuse of discretion may be found in the denial of a motion for a continuance when the moving party has shown good cause for granting the motion,' but 'no abuse of discretion will be found when the moving party has not demonstrated that he or she was prejudiced by the denial.'" *Id.* at 244 (quoting *Rowlett v. Vanderburgh Cnty. Off. of Fam. & Child.*, 841 N.E.2d 615, 619 (Ind. Ct. App. 2006), *trans. denied*).

[23] While parents do not have an "absolute constitutional right . . . to be present at a termination hearing," they must be afforded various protections to ensure they receive due process of law in termination proceedings. *Id.* at 248. They must receive an "opportunity to be heard at a meaningful time and in a meaningful manner." *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). Statutorily, they are entitled to cross-examine witnesses, obtain witnesses or tangible evidence, and introduce evidence on their behalf. Ind. Code § 31-32-2-3(b). Parents are also entitled to proper notice under Indiana Code Section 31-35-2-6.5, which we address later in this opinion. Overall, "[t]he process due in a termination of parental rights proceeding turns on the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen

procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure." *C.G.*, 954 N.E.2d at 917. This flexible standard contemplates that the procedural protections owed may vary based on the demands of the situation. *Id.*

[24] In arguing that the trial court's denial of their motions to continue the termination hearing was an abuse of discretion and violated their due process rights, Parents rely heavily on our Supreme Court's decision in *K.W.* There, a mother facing involuntary termination of her parental rights was incarcerated at the time of the termination fact-finding hearing and her attorney requested a two-week continuance until her anticipated release. *K.W.*, 12 N.E.3d at 243. The trial court denied the motion and held the hearing in mother's absence, which resulted in the termination of her parental rights. *Id.*

[25] On transfer, the Supreme Court vacated the portion of the trial court's order terminating mother's parental rights, finding that the proceeding had been fundamentally unfair and prejudicial. *Id.* at 249. In doing so, the Court applied an eleven-factor test it had adopted in *C.G.* when considering a motion to transport an incarcerated parent to a termination hearing. *Id.* at 244. Although the Court noted that it "was not compelled" to apply the test under these different circumstances, it did so because "a number of th[e] eleven factors [were] helpful in [its] review of the trial court's exercise of its discretion." *Id.* The factors are as follows:

> [T]he trial court judge should balance the following factors: (1) [t]he delay resulting from parental attendance; (2) the need for an

early determination of the matter; (3) the elapsed time during which the proceeding has been pending; (4) the best interests of the child(ren) in reference to the parent's physical attendance at the termination hearing; (5) the reasonable availability of the parent's testimony through a means other than his or her attendance at the hearing; (6) the interests of the incarcerated parent in presenting his or her testimony in person rather than by alternate means; (7) the affect [sic] of the parent's presence and personal participation in the proceedings upon the probability of his or her ultimate success on the merits; (8) the cost and inconvenience of transporting a parent from his or her place of incarceration to the courtroom; (9) any potential danger or security risk which may accompany the incarcerated parent's transportation to or presence at the proceedings; (10) the inconvenience or detriment to parties or witnesses; and (11) any other relevant factors.

*Id.* (quoting *C.G.*, 954 N.E.2d at 922-23). Because we too find that these "factors will help illuminate our review" of whether Parents showed good cause and whether the trial court abused its discretion in denying their motions, we will consider them in this case. *Id.* Having done so, we find no abuse of discretion and no denial of due process in the trial court's decision to deny Parents' motions to continue and proceed in their absence.

[26] Regarding Factor (1), the delay resulting from Parents' failure to appear is difficult to quantify because unlike mother's incarceration for a finite period in *K.W.*, Parents provided no explanation for their failure to attend the hearing. As DCS notes, Father had outstanding warrants for his arrest, "so he could simply have been avoiding arrest." Appellee's Br. at 26. As a result of Parents' unexplained failure to appear, it is unclear what length of continuance would

have been necessary to secure their participation. As to Factor (2), although there was no specific need for urgency, the children ranged from four to nine years old and needed permanency following DCS's involvement for over three years. *Contra K.W.*, 12 N.E.3d at 245 (finding a decreased need for a speedy decision on the termination petition because the child was "less than two years old and already placed outside the home"). Regarding Factor (3), the CHINS proceedings were filed more than three years before the termination fact-finding hearing, and the termination petitions were filed over three months prior to the fact-finding hearing. *See id.* (noting "the more relevant timeframe" is the pendency of the termination proceedings). The fact-finding hearing had already been continued once due to Father's failure to obtain counsel.

[27] Considering a child's best interests under Factor (4), the Supreme Court has simultaneously recognized that while a parent's physical appearance at the hearing "might provide a more accurate outcome, . . . 'children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships.'" *Id.* (quoting *C.G.*, 954 N.E.2d at 917). While the *K.W.* court found that "if the continuance risked an unnecessary delay in K.W.'s adoption, [F]actor (4) would certainly weigh against granting [the mother's] motion[,]" it also determined that the delay was "minimal" because K.W. was "already out of [the mother's] care and in a pre[-]adoptive home." *Id.* The same is not exactly true here because although A.R. and C.R. were in pre-adoptive homes at the time of the fact-finding hearing, R.R. was not, and importantly, the trial court was given no reason for Parents'

absence and no timeframe for securing their participation. We also note that Parents' attorneys had each represented them for a significant portion of the CHINS proceedings and were thus familiar with their clients and the evidence, and they were equipped and given the opportunity to cross-examine DCS's witnesses and defend against termination.

[28] As to Factor (5), the potential availability of the parent's testimony through alternative means, we acknowledge that it would have been "best practice" for Parents' attorneys to attempt to secure their telephonic participation. *Id.* at 246. However, given that the reason for Parents' failure to appear is unknown rather than due to incarceration, we cannot assume they would have been "readily available" to participate remotely as was the case in *K.W. Id.* Nevertheless, given Parents' significant interest in testifying at the fact-finding hearing, we find that Factor (5) and the related Factor (6) weigh in their favor because with no attempt to obtain their remote participation, Parents had no final opportunity to present their own testimony.

[29] Regarding Factor (7)—the effect of Parents' participation on the likelihood of their success on the merits—the record demonstrates there was significant evidence against Parents supporting the trial court's decision to terminate their parental rights. Throughout the underlying CHINS case, Parents consistently struggled to comply with DCS's case plan, engaged in domestic violence, tested positive for illegal substances, and continued to engage in criminality. While we find it exceedingly difficult to believe that Parents' testimony would have altered the trial court's judgment, we acknowledge that we are working with a

one-sided record because Parents were unable to provide "rebuttal evidence or explain[] potentially valid reasons for non-compliance[.]" Appellants' Br. at 19.

[30] Because Factors (8) and (9) are specific to motions to transport incarcerated parents, they are inapplicable to our review. With Factor (10), we understand that a continuance—even a short one—would have inconvenienced the trial court, attorneys, and witnesses. *See K.W.*, 12 N.E.3d at 247 (recognizing that "a two-week continuance would be an inconvenience"). Though the Court reasoned in *K.W.* that the inconvenience of the short continuance requested was mitigated by the fact that several DCS witnesses already planned to testify telephonically, *id.*, the witnesses who testified in this case were, by all indications, present at the courthouse and thus would have been inconvenienced if they needed to return for a rescheduled hearing. We reiterate that beside the fact that the termination hearing had already been continued once to allow Father to secure counsel, it is unclear what length of time would have been sufficient to secure Parents' participation.

[31] After weighing the *K.W.* factors, we conclude that the trial court's denial of Parents' motions to continue the fact-finding hearing was not clearly against the logic and effect of the circumstances before the court. Unlike the mother's *involuntary* absence in *K.W.*, Parents' absences here were unexplained, their attorneys did not articulate good cause for their day-of-hearing motions, and our evaluation of the *K.W.* factors does not show it was an abuse of discretion for the court to find as such and deny the motions.

## 2. Notice

[32] Next, Parents advocate for a change in Indiana law to require petitioners who seek to terminate the parent-child relationship to use heightened methods of service when sending statutory notice of the termination hearing to interested parties under Indiana Code section 31-35-2-6.5.[4]  They also challenge the trial court's finding that they were properly notified.

[33] At the outset, we note that Parents waived these arguments by failing to raise them before the trial court.  "[A]ppellate review presupposes that a litigant's arguments have been raised and considered in the trial court." *Plank v. Cmty. Hosps. of Ind., Inc.*, 981 N.E.2d 49, 53 (Ind. 2013).  A party waives a claim of error, "including a claimed violation of due process rights, by raising it for the first time on appeal." *In re N.G.*, 51 N.E.3d 1167, 1173 (Ind. 2016).  Specific to their statutory notice arguments, this Court has found that compliance with Indiana Code section 31-35-2-6.5 is "'mandatory to effect termination of parental rights.'" *In re H.K.*, 971 N.E.2d 100, 103 (Ind. Ct. App. 2012) (quoting *In re T.W.*, 831 N.E.2d 1242, 1246 (Ind. Ct. App. 2005)).  However, statutory notice is not an element of the petitioner's claim, so "[f]ailure to comply with statutory notice *is thus 'a defense that must be asserted.*'"  *Id.* (quoting *T.W.*, 831

---

[4] We note that after the termination petition was filed and the termination hearing was held in this case, our legislature amended Indiana Code section 31-35-2-6.5. However, the amendment made only a minor change to subsection (h) and the provisions of the statute pertinent here were unchanged.

N.E.2d at 1246) (emphasis added). When properly placed at issue, the petitioner has the burden of proving compliance with the statute. *Id.*

[34] At the beginning of the termination fact-finding hearing, DCS, as well as the trial court, noted that Parents had been properly notified of the hearing yet failed to appear. *See* Tr. Vol. 2 at 14. Despite this prompting, Parents' attorneys did not argue their clients lacked statutory notice or advocate for the heightened service requirements Parents now seek. For these reasons, Parents did not give "the trial court a bona fide opportunity to pass upon the merits" of these arguments and have therefore waived our consideration of them. *Endres v. Ind. State Police*, 809 N.E.2d 320, 322 (Ind. 2004) (noting policy reasons behind this requirement, including "preservation of judicial resources, opportunity for full development of the record, utilization of trial court fact-finding expertise, and assurance of a claim being tested by the adversary process"); *see also In re C.C.*, 170 N.E.3d 669, 676 (Ind. Ct .App. 2021) (finding mother waived insufficient notice argument when she failed to appear at the termination fact-finding hearing and her attorney "failed to argue lack of statutory notice in the trial court").

[35] Waiver notwithstanding, we are not persuaded by Parents' arguments. Indiana Code section 31-35-2-6.5 provides, in relevant part:

> At least ten [] days before a hearing on a petition [to terminate the parent-child relationship,] . . . the person or entity who filed the petition . . . shall send notice of the review to . . . [t]he child's parent[.]

I.C. § 31-35-2-6.5(b)(1), (c)(1).

[36] The statute "does not require compliance with Indiana Trial Rule 4, which governs service of process and incorporates a jurisdictional component." *C.C.*, 170 N.E.3d at 675. Instead, the petitioner need only comply with Indiana Trial Rule 5(B), which governs the service of subsequent pleadings and papers and requires "[s]ervice upon the attorney or party . . . by delivering or mailing a copy of the papers to [the attorney or party] at his last known address." *Id.* at 675-76 (quoting *In re B.J.*, 879 N.E.2d 7, 15 (Ind. Ct. App. 2008), *trans. denied*). If service is made by mail, Trial Rule 5(B)(2) requires proof of service by "written acknowledgment of service, by affidavit of the person who mailed the papers, or by certificate of service" and deems service "complete upon mailing." In *C.C.*, we reiterated the policy behind adhering to these standards in termination cases:

> To require service of subsequent papers, such as hearing notices, to rise to the level of service of process would permit a parent or other party entitled to notice to frustrate the process by failing to provide a correct address and would add unnecessarily to the expense and delay in termination proceedings "when existing provisions adequately safeguard a parent's due process rights."

170 N.E.3d at 676 (quoting *B.J.*, 879 N.E.2d at 15).

[37] On appeal, Parents ask us to "heighten the requirements of Rule 5 for parental termination cases to accommodate the importance of" these proceedings. Appellants' Br. at 22. They argue that we "should require actual delivery . . . or

require [DCS] to use certified mailers with return receipt requested." *Id.* at 23. They also contend that "more than a certificate of service should be required" to prove compliance with the statutory notice requirement by clear and convincing evidence. *Id.*

[38] In support of these arguments, Parents point to *Santosky v. Kramer*, 455 U.S. 745 (1982). But *Santosky* simply enshrined a principle that Indiana law has long since observed—that DCS must prove its allegations by clear and convincing evidence before the trial court may sever the parent-child relationship. *Id.* at 747-48; *see also Ellis v. Knox Cnty. Dep't of Pub. Welfare*, 433 N.E.2d 847, 848 (Ind. Ct. App. 1982) (recognizing *Santosky* and finding unconstitutional the preponderance of evidence burden of proof in termination of parental rights cases set forth in a past Indiana statute); I.C. § 31-37-14-2 ("A finding in a proceeding to terminate parental rights must be based upon clear and convincing evidence.").

[39] Parents' reliance on *Seastrom, Inc. v. Amick Const. Co.*, 306 N.E.2d 125 (Ind. Ct. App. 1974) is similarly misplaced. That case dealt with the methods for filing "papers"—there, a motion to correct error—*with the court* under a prior version of Rule 5(F). *Id.* at 126-27. Ultimately, Parents' arguments have not persuaded us that a departure from established law is required regarding appropriate methods of service and evidence of compliance under Indiana Code section 31-35-2-6.5.

Finally, without challenging the timeliness or substance of the notice, or the address to which it was sent, Parents challenge Finding 63 in the trial court's termination order.[5] Specifically, the court found:

> Although properly notified of the date and time, Mother and Father failed to appear for the termination hearing, further demonstrating their unwillingness to work towards saving their parental rights.

Appellants' Appendix Vol. 2 at 10.

This challenge is premised on our acceptance of Parents' earlier arguments that evidence of actual delivery or service by certified mail with return receipt requested is necessary to comply with Indiana Code section 31-35-2-6.5, and that a standard certificate of service is not sufficient to prove compliance by clear and convincing evidence. Because we have determined that those arguments fail, we similarly reject Parents' argument regarding Finding 63 and conclude that this finding was not erroneous.

## Conclusion

The trial court did not abuse its discretion in denying Parents' motions to continue the termination fact-finding hearing, and we decline Parents' invitation to alter established Indiana law as it relates to methods of service and

---

[5] While the trial court issued separate orders with respect to each child, those orders are nearly identical. However, this finding is Finding 64 in the trial court's order terminating Parents' parental rights to A.R.

evidence of compliance requirements for petitioners to effectuate their statutory notice obligations under Indiana Code section 31-35-2-6.5.

[43] Affirmed.

Altice, C.J., and Pyle, J., concur.

ATTORNEYS FOR APPELLANTS
Mickey K. Weber
New Albany, Indiana

Andrew R. Rutz
Lorch, Naville and Ward, LLC
New Albany, Indiana

ATTORNEYS FOR APPELLEE
Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

David E. Corey
Supervising Deputy Attorney General
Indianapolis, Indiana