## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 21 2019, 8:44 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Patrick M. Schrems
Kara E. Krothe
Bloomington, Indiana

ATTORNEYS FOR APPELLEE:
INDIANA DEPARTMENT OF
CHILD SERVICES

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of: J.W., An.W., F.W., III, Ak.W., and N.W. (Minor Children),

and

P.F. (Mother) and F.W., II (Father),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

August 21, 2019

Court of Appeals Case No. 19A-JT-349

Appeal from the Monroe Circuit Court

The Honorable Stephen R. Galvin, Judge

Trial Court Cause No.
53C07-1806-JT-481
53C07-1806-JT-482
53C07-1806-JT-483
53C07-1806-JT-484
53C07-1806-JT-485

**Tavitas, Judge.**

## Case Summary

[1] P.F. ("Mother") appeals the termination of her parental rights to J.W., Ak.W., F.W., An.W., and N.W. (the "Children"). F.W., II ("Father") appeals the termination of his parental rights to F.W., An.W., and N.W. We affirm.

## Issues

[2] Mother and Father raise several issues, which we restate as:

    I.    Whether the trial court abused its discretion by denying Father's motion to continue the termination of parental rights hearing.

>    II.    Whether the evidence is sufficient to support the
>           termination of Mother's and Father's parental rights.

# Facts

[3] J.W. was born in November 2007 and Ak.W. was born in January 2009 to Mother and M.W.[1] Mother and Father are the parents of F.W., born in November 2010; An.W., born in December 2011; and N.W., born in June 2014.

[4] In November 2015, the Monroe County Department of Child Services ("DCS") received multiple separate reports of neglect and physical abuse regarding the Children. During the investigation, Father ultimately admitted to using a belt to discipline Ak.W., which left a laceration on her thigh. DCS was also informed regarding sexualized behaviors by Ak.W. DCS made a recommendation for an informal adjustment. Shortly thereafter, however, Mother informed DCS that she was moving out of the state with Ak.W., and DCS was unable to make contact with the family.

[5] In February 2017, the Bloomington Police Department was involved in a drug investigation regarding Father. Father was arrested during a traffic stop while two of the Children were in the vehicle with him. Father possessed marijuana at the time. During a search of the family's residence pursuant to a search warrant, Mother and two of the Children were present, and the officers found

---

[1] M.W.'s parental rights were also terminated, but he does not appeal.

marijuana, digital scales, and a handgun. Mother admitted that she had disposed of other drugs prior to the execution of the search warrant. Father admitted that he had been dealing heroin and marijuana out of the family's residence, and Mother admitted that marijuana was smoked in the residence.

[6] The State charged Father with four counts of dealing narcotics, maintaining a common nuisance, and neglect of a dependent. The State charged Mother with neglect of a dependent, obstruction of justice, and maintaining a common nuisance. DCS removed the Children from Mother's and Father's care at that time and placed them in relative care with their paternal grandmother.

[7] On February 6, 2017, DCS filed petitions alleging that the Children were children in need of services ("CHINS"). After a fact-finding hearing, the trial court found that the Children were CHINS. Specifically, the trial court found:

> 2. On February 3, 2017, [Mother] was arrested and charged with Neglect of a Dependent, Obstruction of Justice, and Maintaining a Common Nuisance. Marijuana was found on [Mother]. A gun was found wrapped in a diaper in the children's bedroom. The children were in their mother's care at the time of her arrest. [Mother] admitted to smoking marijuana while the children were in her care.
>
> 3. On November 3, 2017, [Father] was arrested on charges of Dealing Narcotics, Maintaining a common Nuisance, and Neglect of Dependent. Undercover officers had observed [Father] selling heroin on at least 4 occasions. [Father]

admitted to ongoing marijuana and heroin use.[2]  [Father] also has a pending charge for Possession of Marijuana.

4. As a noncustodial parent, [M.W.] would not receive custody of his children if they are not found to be Children in Need of Services.  The children would be returned to their mother.  This is not in the best interests of the children.

5. Given [Mother's] ongoing use of controlled substances and her criminal behavior while the children were present; and in light of [Father's] ongoing use of controlled substances and his criminal behavior, the coercive intervention of the court is clearly necessary to ensure the health and safety of the children.

Ex. Vol. I pp. 71-72.

[8]     At some point, the Children disclosed that they are victims of sexual abuse by multiple perpetrators, which occurred in North Carolina at maternal grandmother's residence.  F.W. described that he witnessed the rape of J.W.

[9]     Paternal grandmother requested that J.W. and Ak.W. be removed from her care after discovering J.W. and Ak.W. engaging in sexualized behaviors with the other Children.  The remaining Children were later removed from paternal grandmother's care after the Children received inappropriate physical discipline.  A protective order was obtained to prevent paternal grandmother

---

[2] DCS presented evidence at the termination of parental rights hearing that Father was dealing heroin, but no evidence was presented during the termination hearing that he was using heroin.

from having any contact with the Children, and the Children were placed in foster care.

[10] In July 2017, the trial court entered a dispositional order, which ordered the parents to receive training in the developmental effects of sexual and physical trauma on the Children. The trial court also ordered Mother, in part, to: (1) participate in a substance abuse evaluation and follow all recommendations; (2) submit to weekly random drug screens; (3) participate in weekly therapy; (4) participate in a parenting assessment; (5) participate in weekly supervised visitation; and (6) participate in home-based case management services. The trial court ordered Father, in part, to: (1) participate in a substance abuse evaluation and follow all recommendations; (2) submit to weekly random drug screens; (3) participate in weekly therapy; (4) participate in weekly supervised visitation; (5) participate in home-based case management services; and (6) participate in the Fatherhood Engagement Program. The trial court ordered the following for the Children:

> 1. Life skills therapy shall be provided.
>
> 2. The IEP [Individualized Education Program] process shall be initiated at their schools. Each IEP should include a comprehensive educational evaluation and accommodations for both educational and behavioral deficits in order to minimize school exclusion.
>
> 3. Visits with the mother shall be fully supervised and therapeutic. They shall take place at least weekly for 2 hours.

4. Group trauma therapy and/or trauma camp program should be investigated and the children should be allowed to participate in these programs when appropriate.

5. Fully supervised and therapeutic sibling visits should occur monthly between [J.W.] and [Ak.W.].

Ex. Vol. I p. 74.

[11] Mother and Father made minimal progress in achieving the goals. The Children have significant needs that even experienced therapeutic foster parents struggled to address. The Children struggle with sexualized behaviors, aggressive behaviors, and multiple mental health disorders. Two of the Children required inpatient treatment. Each child required multiple different placements in foster care and facilities due to the Children's behavioral issues.

[12] DCS filed petitions to terminate Mother's and Father's parental rights in June 2018, and a hearing on the petitions was held on November 29, 2018. At the start of the hearing, Father's attorney stated that DCS's attorney indicated that "they intend[ed] to go to 9:00 p.m." and that she had a conflict. Tr. Vol. II p. 5. The trial court stated that it intended to "complete this case today." *Id.* at 6. Later in the day, Father's attorney requested a continuance, which the trial court denied. On January 14, 2019, the trial court entered extensive findings of fact and conclusions of law and terminated Mother's and Father's parental rights to the Children. Mother and Father now appeal.

# Analysis

## *I. Motion to Continue*

[13] Father argues that the trial court abused its discretion by denying his motion to continue the termination of parental rights hearing. "Generally speaking, a trial court's decision to grant or deny a motion to continue is subject to abuse of discretion review." *In re K.W.*, 12 N.E.3d 241, 244 (Ind. 2014). An abuse of discretion may be found in the denial of a motion for a continuance when the moving party has shown good cause for granting the motion; however, no abuse of discretion will be found when the moving party has not demonstrated that he or she was prejudiced by the denial. *Id.*

[14] At the start of the hearing on the termination of parental rights petitions, Father's attorney expressed displeasure at staying late in the day to complete the presentation of evidence. Later in the day, Father's attorney requested a continuance. At the time of Father's motion, the only remaining witnesses were Father, Mother, the CASA, and a DCS employee that Mother recalled. Father contends that the long day of testimony led to instances of lapses in attention. Father, however, has failed to demonstrate how these lapses of attention prejudiced him or how he was harmed by the denial of the motion to continue. As the State points out, Father does "not point to any substantive evidence [he] would have presented or testimony [he] decided not to present or challenge to support [his] contention the denial of a continuance impacted [his] defense." Appellee's Br. p. 27. Given the failure of Father to demonstrate prejudice, we conclude that the trial court did not abuse its discretion by

denying the motion to continue and requiring the parties to complete the presentation of evidence in one day.

## II. Sufficiency of the Evidence

[15] Mother and Father challenge the termination of their parental relationship with the Children. The Fourteenth Amendment to the United States Constitution protects the traditional rights of parents to establish a home and raise their children. *In re K.T.K. v. Indiana Dept. of Child Services, Dearborn County Office,* 989 N.E.2d 1225, 1230 (Ind. 2013). "[A] parent's interest in the upbringing of [his or her] child is 'perhaps the oldest of the fundamental liberty interests recognized by th[e] [c]ourt[s].'" *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). We recognize that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities by failing to provide for the child's immediate and long-term needs.'" *K.T.K.,* 989 N.E.2d at 1230 (quoting *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

[16] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re C.G.,* 954 N.E.2d 910, 923 (Ind. 2011). We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)).

[17]     Pursuant to Indiana Code Section 31-35-2-8(c), "[t]he trial court shall enter findings of fact that support the entry of the conclusions required by subsections (a) and (b)" when granting a petition to terminate parental rights.[3] Here, the trial court did enter findings of fact and conclusions of law in granting DCS's petition to terminate Mother's and Father's parental rights. When reviewing findings of fact and conclusions of law entered in a case involving the termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[18]     Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section

---

[3] Indiana Code Sections 31-35-2-8(a) and (b), governing termination of a parent-child relationship involving a delinquent child or CHINS, provide as follows:

   (a)  Except as provided in section 4.5(d) of this chapter, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship.

   (b)  If the court does not find that the allegations in the petition are true, the court shall dismiss the petition.

31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (A)   That one (1) of the following is true:
>
> > (i)   The child has been removed from the parent for at least six (6) months under a dispositional decree.
> >
> > (ii)   The court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
> >
> > (iii)   The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child.
>
> (B) that one (1) of the following is true:
>
> > (i)   There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)    that termination is in the best interests of the child; and

(D)    that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016).

### A. Challenge to Findings

[19]    The trial court here made extensive findings of fact and conclusions of law. Mother and Father argue that several of the findings were "either problematic or insufficiently supported by the evidence presented at trial." Appellants' Br. p. 16. Our review of the evidence, the findings, and Mother's and Father's arguments reveals that most of the arguments are merely requests that we reweigh the evidence and judge the credibility of the witnesses, which we cannot do. *See C.G.,* 954 N.E.2d at 923. Many of the arguments address minor factual issues that do not impact the ultimate conclusions of the trial court. To

the extent necessary, we will address challenges to the findings in the context of the arguments below.[4]

## B. Remedy of Conditions Resulting in Removal

[20] Mother and Father challenge the trial court's conclusion that there is "a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied."[5] I.C. § 31-35-2-4(b)(2). "In determining whether 'the conditions that resulted in the [Child's] removal . . . will not be remedied,' we 'engage in a two-step analysis.'" *In re E.M.,* 4 N.E.3d 636, 642-43 (Ind. 2014) (quoting *K.T.K.,* 989 N.E.2d at 1231). "First, we identify the conditions that led to removal; and second, we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id.* In analyzing this second step, the trial court judges the parent's fitness "as of the time of the termination proceeding, taking into consideration evidence of changed conditions." *Id.*

---

[4] DCS concedes that Finding No. 75 contains a scrivener's error, as the finding refers to Father, but the testimony concerns F.W. This error, however, does not impact the outcome here.

[5] Mother and Father also argue that there was no reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of the Children. Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive. Consequently, the DCS was required to demonstrate by clear and convincing evidence a reasonable probability that *either*: (1) the conditions that resulted in the Children's removal or the reasons for placement outside the home of the parents will not be remedied, or (2) the continuation of the parent-child relationship poses a threat to the well-being of the Children. *See, e.g.*, *Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 148 n.5 (Ind. 2005). The trial court here found a reasonable probability that the conditions that resulted in the Children's removal or reasons for placement outside the home of the parents will not be remedied, and there is sufficient evidence to support that conclusion. Accordingly, we do not address whether the continuation of the parent-child relationship poses a threat to the well-being of the Children.

(quoting *Bester,* 839 N.E.2d at 152). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *Id.* "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *Id.*

[21] The Children were initially removed from Mother's and Father's care when both Mother and Father were arrested as a result of Father selling drugs out of the family's residence. It appears from the record that the charges against Mother were resolved, and the charges against Father were still pending at the time of the termination hearing. The Children remained out of Mother's and Father's care because of Father's continued drug usage and Mother's and Father's inability to protect the Children and address their special needs. Although the trial court ordered services in July 2017, Mother and Father made little to no progress during the proceedings.

[22] After their removal, the Children disclosed that they were subjected to significant sexual abuse by multiple third parties. The Children have also molested each other. Mother and Father were generally uncooperative in attempts to identify the perpetrators. Each of the Children has multiple mental health issues that have made caring for them difficult. J.W. has been diagnosed with reactive attachment disorder, post-traumatic stress disorder ("PTSD"), and oppositional defiant disorder. Ak.W. has also been diagnosed with oppositional defiant disorder and attention deficit hyperactivity disorder; she is sometimes incontinent and has been violent and has required inpatient

treatment. F.W. has been diagnosed with PTSD, attention deficit hyperactivity disorder, a depressive disorder, and encopresis; he has hallucinations and a fear of restrooms. An.W. has been diagnosed with attention deficit disorder and possibly PTSD; he required inpatient treatment and has been violent and aggressive. N.W. has sexualized behaviors and is agitated for several days after visits with Mother and Father.

[23] Mother had a psychological assessment in October 2018. Mother received the following diagnosis: "border line intellectual functioning, post-traumatic stress disorder also called PTSD, major depressive disorder recurrent episode unspecified with anxious distress, child neglect suspected initial encounter, personal history which is a past history of spouse or partner violence physical personal history, past history a spouse or partner psychological abuse." Tr. Vol. I pp. 143-44. The therapist recommended counseling with a focus on PTSD, depression, and parenting skills.

[24] Mother's attendance at individual therapy was inconsistent, and she failed to make substantial progress in the therapy sessions. Mother's drug screens were negative, but she missed several of the screens. Mother consistently denied any responsibility for the removal of the Children from her care. Mother did, however, participate in education on the developmental effects of sexual and physical trauma for the Children.

[25] Although Mother attended supervised visitations with the Children, there were issues that visitation service providers had to address. On one occasion,

Mother smoked and cursed in front of J.W.; Mother called visits at the library "boring"; Mother spoke negatively about the family case manager and the service provider supervising visits. Tr. Vol. I p. 29. Once, Mother became very angry, and J.W. told Mother to "calm down and to breath [sic] and to try to have a positive visit." *Id.* at 31. Service providers observed a lack of consistency in bonding between Mother and J.W.; J.W. would try to hug Mother, but Mother would not respond to J.W. During visits, Mother and Father had little control over N.W. and were unable to calm N.W.

[26] In January 2018, Father obtained a substance abuse evaluation. At the evaluation, Father minimized his substance abuse, the need for involvement of DCS, and the safety of the Children. Father told the therapist that he "will never quit using marijuana." Ex. Vol. II p. 256. Although therapy was recommended, Father "disclosed he had no plans of engaging in treatment." *Id.* During the proceedings, Father failed multiple drug screens due to positive results for marijuana, cocaine, and benzoylecgonine. Although Father started treatment in intensive out-patient treatment ("IOP") and recovery coaching, his attendance was sporadic. Father was dismissed from his IOP, and there was no progress in his substance abuse treatment.

[27] At the time of the termination hearing in November 2018, Mother and Father had simply made too little progress. Father continued to use illegal drugs, and Mother and Father were unable to meet the Children's high needs. Mother was inconsistent in admitting her knowledge of the sexual abuse of the Children prior to DCS's involvement. Although Mother admitted to some providers that

she was aware of the abuse, she claimed to others that she was unaware of the abuse until the Children were removed. Mother often told providers that the Children would behave better if they were simply returned to Mother's care. Although Mother had obtained housing prior to the termination hearing, but it was a two-bedroom apartment, which most service providers testified was inappropriate to meet the Children's needs due to their sexualized behaviors and sexual abuse of each other.[6]

[28] Mother consistently minimized her involvement in the cause of the Children's removal and continued placement outside of her home, and Mother and Father consistently failed to recognize the Children's significant needs. Given the lack of progress by Mother and Father, we conclude that the trial court did not clearly err when it found a reasonable probability that the conditions that resulted in the Children's removal or the reasons for placement outside the home of the parents will not be remedied.

### B. Children's Best Interests

[29] Both Mother and Father argue that it was not in the Children's best interests to terminate their parental rights. In determining what is in the best interests of a

---

[6] Mother was also pregnant at the time of the hearing on the termination of parental rights. Mother and Father challenge the trial court's Finding No. 59, that they are engaged to be married and living together. The family case manager testified that she believed Mother and Father were engaged, but no further evidence was presented on the issue. As for housing, Mother and Father were repeatedly vague about their housing situation. Mother had recently obtained a two-bedroom apartment, and Father testified that he had been "trying to get the money for this apartment so we can get the kids." Tr. Vol. II p. 97. Regardless, any errors in the finding do not impact the ultimate conclusions here.

child, the trial court is required to look at the totality of the evidence. *Z.B. v. Indiana Dep't of Child Servs.*, 108 N.E.3d 895, 903 (Ind. Ct. App. 2018), *trans. denied*. In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *In re K.T.K.*, 989 N.E.2d at 1235. A trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is a "central consideration" in determining the best interests of a child. *Id.*

[30] These Children experienced significant sexual trauma and have debilitating and significant mental health needs. In fact, during the foster care placements, both An.W. and Ak.W. required inpatient treatment. Even foster parents with significant experience and training to care for high needs children struggled to care for the Children, and accordingly, multiple placements were required for each child. The Children displayed sexualized behaviors, aggressive behaviors, and incontinence. All of the Children require a high degree of stability and supervision, especially while sleeping. Mother and Father did not make meaningful progress in learning to address the Children's needs. Mother and Father displayed a lack of understanding of the challenges of parenting the

Children.[7] Mother often told service providers that the Children's behaviors would improve if they were returned to her.

[31] The CASA testified that termination of parental rights was in the Children's best interest. According to the CASA, Mother and Father "failed to protect [the Children] from extensive physical, sexual, and emotional abuse" and "failed to acknowledge how their actions or inactions have resulted in this abuse." Tr. Vol. II p. 110. Mother and Father "minimize[d] and dismiss[ed] their children's troubling behaviors even to the point of blaming the children for some of those behaviors." *Id.* Father, additionally, has not achieved sobriety. The CASA testified: "There's no indication that the parents have any ability to obtain and maintain stability in residence, employment, or personal care. There's no indication that this will ever change." *Id.* According to the CASA, the Children "cannot progress in their personal trauma until the parent child relationship is terminated." *Id.*

[32] Under these circumstances, the trial court's conclusion that termination of Mother and Father's parental rights is in the best interest of the Children is not clearly erroneous.

---

[7] Mother contends that her mental disability, alone, is not a proper ground for terminating her parental rights. It is clear, however, that the trial court's decision was not based on Mother's mental disability.

### C. Adequate Plan

[33] Finally, Mother and Father also challenge the trial court's finding that there is a satisfactory plan for the care and treatment of the Children. Indiana courts have held that for a plan to be "'satisfactory'" for the purposes of the termination statute, it "'need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated.'" *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014) (quoting *Lang v. Starke Cnty. Office of Family and Children*, 861 N.E.2d 366, 375 (Ind. Ct. App. 2007), *trans. denied*), *trans. denied*.

[34] Mother and Father argue that DCS has failed to provide proper foster care for the Children and that Mother is willing and able to care for the Children. DCS, however, is only required to offer a general sense of the plan for the Children after termination of Mother's and Father's parental rights. The DCS family case manager testified that the plan for the Children was adoption, and adoption is a satisfactory plan. *See, e.g., Lang*, 861 N.E.2d at 375 (holding that adoption and independent living are satisfactory plans). Some of the Children are already in pre-adoptive homes, and the family case manager testified that adoptive homes could be found for all of the Children. The trial court's finding that DCS had a satisfactory plan is not clearly erroneous.

# Conclusion

The trial court did not abuse its discretion by denying Father's motion for a continuance. Furthermore, the trial court's termination of Mother's and Father's parental rights is not clearly erroneous. We affirm.

Affirmed.

Crone, J., and Bradford, J., concur.